No. 106,306

STATE OF KANSAS, *Appellee*, v. ROGELIO SOTO, *Appellant*.

(322 P.3d 334)

Opinion filed April 11, 2014.

Kevin J. Zolotor, of O'Hara & O'Hara LLC, of Wichita, argued the cause, and Charles A. O'Hara, of the same firm, was on the briefs for appellant.

Lesley A. Isherwood, assistant district attorney, argued the cause, and Marc Bennett, district attorney, Nola Tedesco Foulston, former district attorney, and Derek Schmidt, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

MORITZ, J.: Rogelio Soto appeals his jury conviction and sentence for the first-degree premeditated murder of Arturo Moreno, Jr. Soto seeks a reversal of his conviction and new trial, claiming he was denied his statutory right to a unanimous jury verdict, the jury was given a clearly erroneous aiding and abetting instruction, and the district court abused its discretion in admitting overly gruesome autopsy photographs. We reject each of Soto's claims and affirm his conviction.

Soto also challenges his sentence, claiming the district court erred in imposing a life sentence without the possibility of parole for 50 years (hard 50). Soto contends Kansas' hard 50 statutory procedure as provided in K.S.A. 21-4635 is unconstitutional in light of Alleyne v. United States, 570 U.S. \_\_\_, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). We agree and conclude Kansas' hard 50 sentencing scheme violates the Sixth Amendment to the United States

Constitution as interpreted in *Alleyne* because it permits a judge to find by a preponderance of the evidence the existence of one or more aggravating circumstances necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating circumstances beyond a reasonable doubt. Based on this conclusion, we vacate Soto's sentence and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 17, 2009, Arturo Moreno spent the afternoon and evening at his Wichita apartment with his girlfriend, Aurora Tinoco; Aurora's infant son; Aurora's sister, Pamela Tinoco; and the Tinoco sisters' friend, Lisa Chavez. Aurora had been dating Moreno for about 6 months and knew that he formerly was involved with the Vato Loco Boys, or VLBs, a north side Wichita gang.

With Moreno's permission, Pamela invited her boyfriend, Rogelio Soto, to Moreno's apartment. Soto arrived at Moreno's apartment sometime after 6 p.m., along with his friends Giovanni Gonzalez and Luis Navarrette-Pacheco. Soto and his friends were affiliated with the Lopers, a subset of the Surenos, or Sur 13s, a south side Wichita gang and known VLB rival.

Officer Jeremy Miller, a gang intelligence officer, testified at Soto's trial about the rivalry between the Sur 13s and the VLBs. Miller explained that the rivalry intensified in the late 1990s when VLB members killed 8-year-old Tony Galvan, a.k.a. "Little Tony," in a drive-by shooting. Although Galvan was not a known gang member, he lived in a close-knit south side community that was primarily Sur 13 territory. According to Miller, the Sur 13s perceived Galvan's murder both as a sign of disrespect to the Sur 13s and as the killing of a family member. Miller explained that just the mention of Galvan's murder could "spike violence" between the Sur 13s and the VLBs.

On the evening of the murder, Moreno primarily stayed inside his apartment with Aurora and her son, while Pamela, Soto, and their friends congregated outside, dancing, drinking, and listening to music. Pamela took photographs, several of which depicted Soto and Navarrette-Pacheco holding beer cans and bottles and "throw-

ing up gang signs." At some point, everyone gathered inside Moreno's apartment and continued drinking and listening to music. Pamela and Gonzalez played chess in Moreno's living room. According to Aurora and Pamela, Moreno interacted with Soto and his friends, and no one argued about gang affiliation.

Aurora and her son, along with Pamela and Chavez, left Moreno's apartment at about 9 p.m., while Soto, Gonzalez, and Navarrette-Pacheco remained at the apartment. Neither sister was concerned that anything would happen because when they left "everything was cool."

Shortly after Aurora and Pamela left Moreno's apartment, Gonzalez and Navarrette-Pacheco also left to pick up a fourth friend, Angel Castro. Around 9:25 p.m. Soto sent Pamela a text message from Moreno's cell phone and told Pamela he and Moreno were alone. When Soto's friends returned to the apartment, Soto told Castro not to touch anything. Castro thought Soto was playing around so Castro eventually handled a beer can and a remote control. Everyone gathered in the living room.

Not long after Castro arrived, he overheard Moreno talking on the phone. It sounded to Castro as though Moreno was either taking responsibility for a young boy's killing or talking to someone who was claiming responsibility for the killing.

Bryan Duran, Moreno's friend and coworker, testified that at about 10 p.m. the night of the murder he spoke on the phone with Moreno, who sounded as if he had been drinking. At one point, Moreno told Duran he loved him and would die for him. Moreno asked Duran about Tony Galvan's murder, and Duran responded that Galvan's killers were caught almost immediately after the shooting. In the background, Duran could hear music and people conversing in Spanish. Duran asked Moreno if everything was okay and whether Moreno wanted Duran to come over. Moreno said he was fine.

Shortly after Moreno ended his phone call, Castro looked up and saw Soto holding a knife. Castro stood up to walk outside, and as he did so he heard Moreno twice ask, "Why?" Castro walked outside to a fence in the backyard, urinated, and stayed outside for

a "short time." When he returned to the apartment, he could see blood on the floor of the living room.

Castro entered the living room to retrieve the beer can and remote control he had touched, and as he did so, he could see Moreno's body lying on the floor in a pool of blood. Castro took the items outside and placed them in Gonzalez' truck and watched as Soto, who had bloody hands, placed a black trash bag in the bed of the truck. Castro did not know the contents of the trash bag, but he thought it might contain the murder weapons. All four men got into the truck, and Castro drove away from the apartment. At some point, Castro asked Soto "why'd he do it, why did they do it, and [Soto] just said, [Be]cause of Little Tony." The group discussed the need to clean Gonzalez' truck and someone suggested they check their shoes for blood.

Castro drove to an area of south Wichita near the Arkansas River where Soto, Gonzalez, and Navarrette-Pacheco disposed of the black trash bag and other items taken from Moreno's apartment, including the remote control and beer can. Castro then drove the group to Soto's home where Soto, Gonzalez, and Navarrette-Pacheco changed clothes and placed their soiled clothing in Soto's washing machine. Gonzalez left Soto's house around 11 p.m., and Castro and Navarrette-Pacheco left around midnight.

Sometime after 11:30 p.m., Moreno's brother, David Moreno, discovered Moreno's body and flagged down a police officer driving through the neighborhood. Based on information from David, Aurora, and Pamela, officers quickly developed four suspects: Soto, Gonzalez, Navarrette-Pacheco, and Castro.

Through investigation, law enforcement officers discovered Moreno's blood on several items: Gonzalez' shoes, Soto's left shoe, Navarrette-Pacheco's shorts, Castro's jeans, and the exterior of Gonzalez' truck near the passenger side door. They also discovered that zigzag patterns on the soles of both Castro's and Soto's shoes were consistent with zigzag shoe patterns found in blood on Moreno's apartment floor. Additionally, after Castro led officers to the location where he and the others disposed of items from Moreno's apartment, officers recovered a torn black trash bag containing a

black shirt, beer cans, a beer bottle, and a remote control; a paper sack containing a knife; a DVD player; and several chess pieces.

Detective Wendy Hummell testified she interviewed Castro twice. During the second interview, Castro said he and Soto talked in Gonzalez' truck after the murder and Soto told Castro that Soto and Moreno had discussed Little Tony's murder while they were alone in the apartment. Further, Soto told Castro that Moreno confessed to killing Little Tony and that Soto " 'just kept keeping it cool' " until the others returned to Moreno's apartment.

Dr. Bamidele Adeagbo performed Moreno's autopsy and testified at trial that Moreno bled to death from a combination of 79 stab wounds and cuts, including cuts to main arteries on both sides of his neck and several deep stab wounds to his right lung, liver, intestines, and diaphragm. Adeagbo explained that while it was difficult to determine from Moreno's injuries whether he had been stabbed by more than one person, the different wound sizes suggested the use of more than one weapon.

Gary Miller, a firearm and toolmark examiner, examined several knives recovered during the investigation. Miller compared each knife to a cast made from one of Moreno's deep stab wounds. Miller could not exclude three of the knives as the weapon that caused that particular injury—a knife found on Moreno's bookshelf, a multipurpose tool found in Gonzalez' truck, and the knife found near the river.

In an interview with Detective Robert Chisholm the day following the murder, Soto admitted he was at Moreno's apartment on the night of the murder and he was affiliated with the Lopers. But Soto maintained he and his friends left the apartment immediately after Aurora and Pamela left. When asked to explain the blood found on his shoes, Soto suggested it appeared through "witchcraft or something." During the interview, Chisholm did not see any injuries on Soto's hands.

After the State charged Soto, Gonzalez, and Navarrette-Pacheco with first-degree premeditated murder, Castro pled guilty to aiding a felon and agreed to testify at Soto's trial. The district court granted the State's motion to prosecute Soto, who was 16 years old at the time of the murder, as an adult and tried him separately

from the other defendants. A jury found Soto guilty of first-degree premeditated murder.

The State filed notice of its intent to seek a hard 50 sentence, alleging Soto committed the crime in an especially heinous, atrocious, or cruel manner. After an evidentiary hearing at which the State presented evidence related to Soto's gang activities before and after the murder and Soto presented evidence of multiple mitigating circumstances, the district court agreed that Soto committed the murder in a heinous, atrocious, and cruel manner and found only one mitigating circumstance, Soto's age. The court then imposed a hard 50 sentence after determining the aggravating circumstance was not outweighed by the mitigating circumstance. This court's jurisdiction over Soto's direct appeal arises under K.S.A. 2013 Supp. 22-3601(b)(3) (life sentence imposed).

## DISCUSSION

*Soto Was Not Denied His Statutory Right to a Unanimous Jury Verdict*

On appeal, Soto argues he was denied his statutory right to a unanimous jury verdict in two respects. First, he argues the district court instructed the jury it could find him guilty of committing first-degree murder based on alternative means and the evidence was insufficient to support either means. Second, he contends the State presented evidence of multiple acts to support the murder charge but failed to elect a specific act, and the district court failed to instruct the jury it must unanimously agree on the specific act supporting the charge.

K.S.A. 22-3421 requires jury unanimity as to guilt in a criminal case. Jury unanimity concerns arise when the court instructs the jury on alternative means of committing the crime charged but the State fails to present substantial evidence of both means. See *State v. Brown*, 295 Kan. 181, 188, 284 P.3d 977 (2012) (discussing alternative means rule and its corollary super-sufficiency requirement). Jury unanimity concerns may also arise when the jury hears evidence of multiple acts that could each constitute the crime charged but the State fails to elect the specific act it relies on to support the charge and the district court fails to instruct the jury

it must unanimously agree on the defendant's guilt as to a specific act. See *State v. Ultreras*, 296 Kan. 828, 854-55, 295 P.3d 1020 (2013) (discussing multiple acts cases and three-part analysis). Contrary to Soto's argument, neither jury unanimity concern presents itself here.

*The jury was not instructed on alternative means of committing first-degree murder, and the evidence is sufficient to support Soto's conviction.*

Relying on *State v. Boyd*, 46 Kan. App. 2d 945, 268 P.3d 1210 (2011), Soto argues the court instructed the jury on alternative means of committing first-degree murder because he could have been convicted of that crime as a principal or as an aider and abettor. See 46 Kan. App. 2d at 953 (concluding that instructing jury on aiding and abetting as set out in K.S.A. 21-3205[1] creates alternative means issue). Based on his assumption that these were alternative means, Soto argues the evidence was insufficient to support either means and his murder conviction must be reversed.

Our decision in *State v. Betancourt*, No. 106,318, 299 Kan. 131, 322 P.3d 353 (2014), forecloses Soto's argument. There, we explained that the Kansas aiding and abetting statute does not add distinct material elements to the definition of the charged crime, thus creating alternative means of committing that crime. Rather, the aiding and abetting statute simply extends criminal responsibility to a person other than the principal actor. 299 Kan. at 140. Thus, we reject Soto's argument that the jury instructions in this case created an alternative means problem.

Nevertheless, it is necessary to consider Soto's argument regarding the "super-sufficiency" of the evidence, as he claims the evidence is insufficient to support his guilt *either* as an aider or abettor *or* as a principal. Given that these were the only two theories of criminal liability presented to the jury, we construe Soto's argument as a general challenge to the sufficiency of the evidence to support his conviction. We recently reiterated the standard of review applied to a sufficiency challenge:

"When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to

the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. [Citation omitted.]" *State v. Remmert*, 298 Kan. 621, 629, 316 P.3d 154 (2014).

Here, to establish Soto's guilt for premeditated first-degree murder, the State was required to prove beyond a reasonable doubt that Soto premeditated and intended Moreno's death and that Soto either committed the physical acts that led to Moreno's death or facilitated another in committing those acts. See K.S.A. 21-3401(a) (defining premeditated first-degree murder); K.S.A. 21-3205(1) (defining liability for intentional crimes of another); *State v. Baker*, 287 Kan. 345, 366, 197 P.3d 421 (2008) (stating that to establish guilt on basis of aiding and abetting, State must show that defendant knowingly associated with unlawful venture and participated in a manner indicating he or she was facilitating success of venture); *State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 (2005) ("[A] person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim.").

Based on the evidence presented by the State, as previously detailed in this opinion, we are firmly convinced that a rational jury could have concluded, beyond a reasonable doubt, that Soto was guilty either as a principal or an aider and abettor.

*The district court did not err in failing to give a jury unanimity instruction because this is not a multiple acts case.*

Alternatively, Soto argues the district court erred in failing to give a unanimity instruction because the State presented evidence of multiple acts but failed to elect a specific act to support the charge.

We have explained that in a multiple acts case the State alleges several acts, any one of which could constitute the crime charged, and the jury must be unanimous as to which act the defendant committed. See *State v. Jones*, 295 Kan. 1050, Syl. ¶ 3, 288 P.3d 140 (2012). When jury unanimity is at issue on this basis, the threshold question is whether we are presented with a multiple

acts case. We exercise unlimited review over this question of law. *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007).

Soto's argument as to the existence of multiple acts is unclear. He points out that the State presented evidence that Soto directed Castro not to touch anything when Castro arrived at the apartment and that Soto and his friends cleaned up everything they touched in the apartment, took several items from the apartment, and threw the items in the river. Soto appears to suggest that these actions were "multiple acts" that independently would have supported the charge of first-degree premeditated murder based on the theory of aiding and abetting. We disagree.

Regardless of whether the State proved Soto acted as a principal or an aider and abettor, this case cannot be a multiple acts case because there was only one killing. Stated another way, none of the "acts" Soto relies upon to support his multiple acts argument are factually and legally sufficient to satisfy all of the elements of first-degree premeditated murder. See *State v. Trujillo*, 296 Kan. 625, 629-30, 294 P.3d 281 (2013) (threshold question is "whether the defendant's actions could have given rise to multiple counts of the charged crime"); *State v. Zabrinas*, 271 Kan. 422, 439, 24 P.3d 77 (2001) ("Multiple acts instructions are only necessary where the facts show separate incidents that are factually and legally sufficient to satisfy all of the elements of the crime.").

Because this is not a multiple acts case, we conclude the district court did not err in failing to give a jury unanimity instruction.

*The Aiding and Abetting Instruction Was Not Clearly Erroneous*

Next, Soto argues the district court improperly instructed the jury on aiding and abetting.

The jury received the following aiding and abetting instruction, which conforms with PIK Crim. 3d 54.05 (responsibility for crimes of another):

"A defendant who, either before or during its commission, intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Soto argues this instruction misstated the law because it used the phrase "a crime" followed by the phrase "the crime." Specifically, he reasons that the instruction permitted a reasonable juror to conclude that if Soto aided or abetted another to commit "a crime," then he is guilty of "the crime" committed even if it was a different crime than he aided or abetted.

Because Soto failed to object below, we review for clear error. See K.S.A. 2013 Supp. 22-3414(3); *State v. Robinson*, 293 Kan. 1002, 1036, 270 P.3d 1183 (2012). Applying that review, we first determine whether the given instruction was erroneous. This is a legal question subject to de novo review. *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012).

As the State points out, this court has repeatedly approved PIK Crim. 3d 54.05 as a correct statement of Kansas law on aiding and abetting. See, *e.g.*, *Betancourt*, 299 Kan. at 134-39; *State v. Llamas*, 298 Kan. 246, 258-60, 311 P.3d 399 (2013) (citing cases); *Engelhardt*, 280 Kan. at 132. Soto provides no persuasive argument for reconsideration of these recent decisions, and we reject his claim of error.

*The District Court Did Not Abuse Its Discretion in Admitting Autopsy Photographs*

Over Soto's objections, the district court admitted 32 autopsy photographs. On appeal, Soto claims the district court abused its discretion in admitting 6 of the 32 photographs—State's Exhibits 28T, 28U, 28V, 28W, 28Z, and 28AA. He argues these photographs were overly gruesome, not natural, inflammatory, and prejudicial, and their erroneous admission was not harmless.

When a defendant challenges the admission of photographic evidence, we first determine the photographs' relevancy. Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant to a murder charge. *State v. Burnett*, 293 Kan. 840, 853, 270 P.3d 1115 (2012). When a party argues photographs are overly repetitious, gruesome, or inflammatory, *i.e.*, unduly prejudicial, we review for an abuse of discretion. *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012). "The admis-

sion of photographs in a murder case has rarely been held to be an abuse of discretion." *Rodriguez*, 295 Kan. at 1157.

The State admitted through Dr. Adeagbo all six of the photographs of which Soto now complains. Dr. Adeagbo described Exhibit 28T as a photograph depicting the inside of Moreno's neck to show damage to the internal jugular vein and Exhibit 28U as a photograph depicting a closer view of the same injury. Dr. Adeagbo testified this particular injury encompassed both a deep stab wound that penetrated the jugular vein and an internal cut that caused a major tear of the vein. Dr. Adeagbo described Exhibits 28V and 28W as photographs depicting the thyroid cartilage he removed from Moreno's neck during the autopsy to demonstrate a stab wound that cut through the cartilage. Notably, the thyroid cartilage stab wound depicted in these photographs is the same wound from which Gary Miller made a cast for comparison with potential murder weapons. Finally, Dr. Adeagbo described Exhibits 28Z and 28AA as photographs depicting the inside of the chest cavity, with organs removed, to show one or two stab wounds that penetrated through the skin and muscle and into the chest cavity.

As Soto suggests, the cause of death in this case was neither disputed nor complex; Moreno bled to death from 79 stab wounds. But even when the cause of death is not disputed, the State is allowed to introduce photographic evidence in murder cases to demonstrate the fact and manner of death and the violent nature of the crime. See *Burnett*, 293 Kan. at 853-54. Here, the six autopsy photographs Soto challenges demonstrate the manner of death and the violent nature of the crime and depict only a few of Moreno's 79 wounds. Based on our review, we find these photographs relevant and not overly gruesome, inflammatory, or unduly prejudicial. Accordingly, the district court did not abuse its discretion in admitting the photographs.

*The District Court Erred in Imposing a Hard 50 Sentence*

After Soto's conviction, the State filed notice of its intent to seek a hard 50 sentence, alleging Soto committed the crime in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4636(f). In response, Soto argued imposition of a hard 50 sentence against

a juvenile offender was prohibited under the Eighth Amendment to the United States Constitution and Section 9 of the Kansas Constitution Bill of Rights. Alternatively, Soto argued a hard 50 sentence would be unconstitutionally disproportionate under the facts of his case. Finally, Soto asserted the evidence did not support the aggravating circumstance alleged by the State and several mitigating circumstances weighed against imposition of a hard 50 sentence.

After receiving evidence and hearing arguments from both parties, the district court rejected Soto's constitutional challenges to imposition of a hard 50 sentence. Next, the court found by a preponderance of the evidence that Soto committed the crime in an especially heinous, atrocious, or cruel manner, noting the victim was aware of his fate, Soto committed continuous acts of violence before the killing, and Soto desecrated the body in a manner indicating a particular depravity of mind. See K.S.A. 21-4636(f)(5) and (6). The court inferred from the evidence that even if Moreno's wounds were inflicted by more than one knife, Soto "was the sole actor if not the primary actor." Finally, the court found Soto's age to be the only mitigating circumstance and concluded this mitigating circumstance did not outweigh the aggravating circumstance. Accordingly, the court imposed a hard 50 sentence.

In his initial appeal brief, Soto argued the district court erroneously imposed a hard 50 sentence because the evidence was insufficient to establish the aggravating factor that Soto personally committed the crime in a heinous, atrocious, or cruel manner. See K.S.A. 21-4636(f). Additionally, he argued the Eighth Amendment to the United States Constitution prohibited imposition of the hard 50 sentence either as a matter of law because he committed the murder as a juvenile or because it was a disproportionate sentence under the facts of this case.

After the parties filed their initial briefs, the United States Supreme Court extended the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and held that the Sixth Amendment's right to a jury trial requires that any fact that increases a mandatory minimum sentence increases the penalty for a crime and, therefore, is an " 'element' "

that must be submitted to a jury and proved beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2162-63, 186 L. Ed. 2d 314 (2013).

After *Alleyne*, we granted Soto's motion to file a supplemental brief challenging the constitutionality of his hard 50 sentence as violative of his right to a jury trial. In that brief, Soto argues Kansas' statutory procedure for imposing a hard 50 sentence, K.S.A. 21-4635, clearly violates *Alleyne* because it permits imposition of an increased mandatory minimum sentence based on judicial fact-finding by a preponderance of the evidence. In its response, the State concedes Kansas' hard 50 sentencing scheme contains a "judicial factfinding component" in that it requires a judge to find the existence of aggravating factors. But the State attempts to distinguish the hard 50 sentencing scheme from the sentencing scheme at issue in *Alleyne* and maintains that *Alleyne* did not implicate the constitutionality of K.S.A. 21-4635.

Before oral argument in this case, we directed the parties to file additional supplemental briefs addressing whether an *Alleyne* error is subject to harmless error review and, if so, whether any error in this case was harmless. Soto's supplemental brief generally contends an *Alleyne* error is not amenable to a harmless error analysis. Alternatively, he argues the error in this case was not harmless. In contrast, the State contends harmless error review is appropriate and the error here was harmless.

1. *Overview of hard 50 sentencing scheme and post-*Apprendi *and pre-*Alleyne *developments*

In Kansas, the statutorily authorized maximum sentence for a conviction of first-degree premeditated murder is life imprisonment. K.S.A. 2013 Supp. 21-6806(c). Ordinarily, the mandatory minimum sentence is 25 years. K.S.A. 2013 Supp. 22-3717(b)(1); see also *State v. Warledo*, 286 Kan. 927, 955, 190 P.3d 937 (2008) ("In determining whether to impose a hard 50 sentence, the sentencing court is considering the minimum sentence, not the maximum."). But, in some cases, the sentencing court may impose an increased mandatory minimum sentence of either 40 or 50 years.

The hard 50 sentencing scheme in effect at the time of Soto's offense provided that for any defendant convicted of first-degree premeditated murder committed on or after July 1, 1999, the sentencing court "shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of . . . 50 years or sentenced as otherwise provided by law." K.S.A. 21-4635(b). To make that determination, the court considered evidence relevant to any statutory aggravating circumstances alleged by the State and any mitigating circumstances. K.S.A. 21-4635(c). But if the court made certain findings, it was required to impose a hard 50 sentence:

"If the court finds that one or more of the aggravating circumstances enumerated in K.S.A. 21-4636 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant *shall be sentenced pursuant to K.S.A. 21-4638* and amendments thereto; otherwise, the defendant shall be sentenced as provided by law. The court shall designate, in writing, the statutory aggravating circumstances which it found." (Emphasis added.) K.S.A. 21-4635(d).

Shortly after the Supreme Court issued its decision in *Apprendi*, this court in *State v. Conley*, 270 Kan. 18, 30-35, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), considered the constitutionality of the hard 40 sentencing scheme—amended in 1999 to a hard 50 scheme. See K.S.A. 21-4635 (Furse 1995) (permitting imposition of 40-year mandatory minimum sentence for first-degree premeditated murder); K.S.A. 1999 Supp. 21-4635 (reflecting hard 50 amendment). The *Conley* court acknowledged *Apprendi's* holding that " 'other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the *prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt.' (Emphasis added.) 147 L. Ed. 2d at 455." *Conley*, 270 Kan. at 34. However, the court found *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), rather than *Apprendi*, controlled this issue. See also *State v. Johnson*, 284 Kan. 18, 23, 159 P.3d 161 (2007) (upholding constitutionality of hard 50 scheme under *McMillan* rationale), *cert. denied* 552 U.S. 1104 (2008).

In *McMillan*, the Court upheld the constitutionality of Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa. Cons. Stat. § 9712 (1982). The Act applied to convictions of several enumerated felonies and required a sentencing judge to impose a mandatory minimum sentence of 5 years if the judge found by a preponderance of the evidence that the defendant "visibly possessed a firearm" during the commission of the underlying felony. 477 U.S. at 81-82. The *McMillan* Court ultimately concluded the visible possession of a firearm represented a "sentencing factor" to be considered by the sentencing court rather than an "element" the State must prove to a jury beyond a reasonable doubt. 477 U.S. at 85-93.

Two years after this court's decision in *Conley*, the United States Supreme Court in *Harris v. United States*, 536 U.S. 545, 568, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002), reaffirmed *McMillan* in light of *Apprendi*. The statutory sentencing scheme at issue in *Harris*, 18 U.S.C. § 924(c) (2012), provided ascending mandatory minimum sentences depending on whether the defendant possessed (5 years), brandished (7 years), or discharged (10 years) a firearm during the commission of an enumerated felony. 536 U.S. at 550-51. Relying on *McMillan*'s distinction between factual findings that increase a maximum sentence beyond what the jury verdict would allow, which the Court characterized as "elements," and factual findings that increase a mandatory minimum sentence, which the Court characterized as "sentencing factors," the *Harris* Court reconciled *Apprendi* and *McMillan*. *Harris*, 536 U.S. at 557, 564-65; see also *McMillan*, 477 U.S. at 85-86, 91.

The same year the Court issued *Harris*, it relied on *Apprendi* to hold Arizona's capital sentencing scheme unconstitutional in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). Under that sentencing scheme, the death penalty could be imposed following a bifurcated trial if, (1) during the guilt phase, a jury convicted the defendant of capital murder and, (2) during the penalty phase, the trial judge found, beyond a reasonable doubt, the existence of at least one aggravating circumstance and " 'no mitigating circumstances sufficiently substantial to call for leniency.' " 536 U.S. at 592-93.

Before *Apprendi*, the United States Supreme Court had upheld the constitutionality of the same Arizona capital sentencing scheme in *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In *Walton*, the Court specifically rejected the defendant's argument that Arizona's aggravating factors were " 'elements' of the offense" that must be submitted to and found by a jury to satisfy the Sixth Amendment. 497 U.S. at 648-49. Relying on *Walton*, the Arizona Supreme Court had upheld the scheme and Ring's death sentence. See *State v. Ring*, 200 Ariz. 267, 280, 25 P.3d 1139 (2001).

But in *Ring v. Arizona*, the Court overruled *Walton* in part, specifically rejecting the distinction drawn in *Walton* between elements of an offense and sentencing factors. *Ring*, 536 U.S. at 608-09. The *Ring* Court noted: "*Apprendi* repeatedly instructs [that as to elevation of the maximum punishment] the characterization of a fact or circumstance as an 'element' or a 'sentencing factor' is not determinative of the question 'who decides,' judge or jury." 536 U.S. at 604-05. The Court ultimately held: "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' . . . the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609.

Two years later, in *Blakely v. Washington*, 542 U.S. 296, 299, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the Court considered *Apprendi*'s application to a Washington statute that permitted imposition of an "exceptional" sentence, *i.e.*, a sentence exceeding the standard sentencing range under Washington's sentencing guidelines, if the judge found " 'substantial and compelling reasons justifying an exceptional sentence.' " The *Blakely* Court briefly summarized its holdings in *Apprendi* and *Ring*, stating: "In each case, we concluded that the defendant's constitutional rights had been violated because the judge had imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding." *Blakely*, 542 U.S. at 303. The Court clarified that the " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 542 U.S. at 303.

Significantly, the *Blakely* Court rejected the State's attempt to distinguish *Apprendi* and *Ring* based on the fact "that the enumerated grounds for departure in its regime are illustrative rather than exhaustive," stating:

"Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or *any* aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact." *Blakely*, 542 U.S. at 305.

Ultimately, the *Blakely* Court concluded that "[b]ecause the State's sentencing procedure did not comply with the Sixth Amendment, petitioner's sentence is invalid." 542 U.S. at 305.

In sum, before *Alleyne*, the United States Supreme Court held that any additional facts necessary to increase the punishment for a crime beyond the *maximum* punishment a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant must be submitted to a jury and proven beyond a reasonable doubt. In contrast, additional facts necessary to increase the mandatory *minimum* sentence were merely sentencing factors that could be found by a judge rather than a jury.

In several cases decided after *Harris* and *Ring*, this court maintained its reliance on *McMillan* to uphold the constitutionality of the hard 40/50 sentencing scheme, noting that *Harris* reaffirmed *McMillan* even after *Apprendi*. See *State v. Astorga*, 295 Kan. 339, 354, 284 P.3d 279 (2012), ("We have consistently upheld the constitutionality of the hard 40/hard 50 sentencing scheme in light of both *Ring* and *Apprendi*, and we decline Astorga's invitation to reconsider our prior decisions."), *cert. granted, judgment vacated by Astorga v. Kansas*, 133 S. Ct. 2877 (2013); *State v. McCaslin*, 291 Kan. 697, 729-30, 245 P.3d 1030 (2011) (citing cases); *State v Albright*, 283 Kan. 418, 423-24, 153 P.3d 497 (2007) (same); see also *Johnson*, 284 Kan. at 23 (upholding constitutionality of hard 50 scheme after noting *McMillan* had not been overruled despite several post-*Apprendi* decisions invalidating judicial factfinding exposing defendants to increased maximum sentences).

## 2. *The changed landscape after* Alleyne v. United States

In *Alleyne*, 133 S. Ct. at 2160-63, the Supreme Court considered the constitutionality of the same statute at issue in *Harris*, 18 U.S.C. § 924(c), and overruled both *Harris* and *McMillan*.

Relying on *Harris*, the lower courts rejected Alleyne's Sixth Amendment challenge to his mandatory minimum sentence of 7 years, a sentence based on a judicial finding, by a preponderance of the evidence, that he had brandished a firearm. Notably, the jury's verdict form indicated the jury found beyond a reasonable doubt that Alleyne used or carried a firearm, but it did not find that Alleyne brandished a firearm. Thus, the jury's verdict authorized a mandatory minimum sentence of only 5 years rather than 7 years. See 18 U.S.C. § 924(c)(1)(A)(i) and (ii).

The *Alleyne* Court found *Harris'* "distinction between facts that increase the statutory maximum and facts that increase only the mandatory minimum" inconsistent with *Apprendi* and overruled *Harris*. *Alleyne*, 133 S. Ct. at 2155, 2163. The Court noted that "facts increasing the legally prescribed floor *aggravate* the punishment," and explained that "the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury." 133 S. Ct. at 2161.

Applying its holdings to the facts of the case before it, the *Alleyne* Court concluded:

"Here, the sentencing range supported by the jury's verdict was five years' imprisonment to life. The District Court imposed the 7-year mandatory minimum sentence based on its finding by a preponderance of the evidence that the firearm was 'brandished.' Because the finding of brandishing increased the penalty to which the defendant was subjected, it was an element, which had to be found by the jury beyond a reasonable doubt. The judge, rather than the jury, found brandishing, thus violating petitioner's Sixth Amendment rights." 133 S. Ct. at 2163-64.

## 3. *Application of* Alleyne *to Kansas' hard 50 sentencing scheme*

In his supplemental brief addressing *Alleyne*'s application in this case, Soto argues *Alleyne* renders Kansas' statutory procedure for imposing a hard 50 sentence, K.S.A. 21-4635, unconstitutional because the statute permits a judge to find the aggravated facts nec-

essary to impose an increased mandatory minimum sentence of 50 years by a preponderance of the evidence rather than requiring a jury to make the necessary findings beyond a reasonable doubt.

In response, the State contends *Alleyne's* holding does not apply to Kansas' hard 50 statute because the Kansas scheme prescribes no mandatory minimum sentence. Alternatively, the State concedes that while Kansas' hard 50 sentencing scheme contains a "judicial factfinding component," in that it requires a judge to find the existence of aggravating factors, *Alleyne* did not implicate the constitutionality of K.S.A. 21-4635 because "that piece [of K.S.A. 21-4635 that requires the finding of aggravating factors] merely serves to inform judicial sentencing discretion."

### a. Standard of review

Determining a statute's constitutionality is a question of law subject to unlimited review. We presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Further, we must interpret a statute in a manner that renders it constitutional if there is any reasonable construction that will maintain the legislature's apparent intent. *State v. Gaona,* 293 Kan. 930, 957-58, 270 P.3d 1165 (2012).

### b. Kansas' hard 50 sentencing scheme includes a mandatory minimum sentence.

Preliminarily, the State suggests *Alleyne's* holding does not apply to Kansas' hard 50 scheme because, unlike the mandatory minimum sentence at issue in *Alleyne,* Kansas' hard 50 statute prescribes no mandatory minimum sentence. Instead, the State maintains that under K.S.A. 21-4706(c), the statutorily required sentence for premeditated first-degree murder is life in prison regardless of whether the court finds aggravating or mitigating factors during sentencing.

We reject the State's suggestion that the hard 50 scheme does not contemplate a mandatory minimum sentence for two reasons. First, we note that in several pre-*Alleyne* cases the State consistently urged this court to uphold the constitutionality of the hard 50 scheme under the rationale of *State v. Conley,* 287 Kan. 696,

197 P.3d 837 (2008), and its progeny. In those cases, this court found the hard 50 scheme constitutional because it only increased the "mandatory minimum sentence," as permitted by *McMillan*. See, *e.g.*, *Conley*, 287 Kan. at 700-01 (discussing *McMillan* and Kansas cases upholding constitutionality of hard 40/50 scheme on grounds it only increases minimum sentence).

Second, even if the State's current posture was not wholly inconsistent with its pre-*Alleyne* position, we would reject the State's argument on its merits based on the express language of the hard 50 scheme which contemplates a mandatory minimum sentence of 50 years. See K.S.A. 21-4635(b) (requiring court to determine "whether the defendant shall be required to serve a mandatory term of imprisonment of . . . 50 years"); K.S.A. 21-4638 (defendant sentenced under hard 50 scheme "shall not be eligible for parole prior to serving 50 years' imprisonment" and "[f]or crimes committed on or after July 1, 2006, *a mandatory minimum term of imprisonment* of 50 years shall not apply" if court finds defendant would be subject to longer term of imprisonment under sentencing guidelines [emphasis added]).

*c. Kansas' hard 50 sentencing scheme violates the Sixth Amendment.*

The State concedes, as it must, that Kansas' hard 50 sentencing scheme contains a "judicial factfinding component" in that it requires a judge to find the existence of aggravating factors. Nevertheless, the State contends *Alleyne* did not implicate the constitutionality of K.S.A. 21-4635 because the judge's finding of aggravating factors merely "informs" judicial sentencing discretion.

But the Supreme Court's collective rationale in *Ring* and *Alleyne* precludes the State's position. Under *Ring*'s rationale, Kansas' enumerated hard 50 aggravating circumstances operate as the functional equivalent of "elements" of a greater offense. See 536 U.S. at 609. And under *Alleyne*'s rationale, we can no longer distinguish between a fact that exposes a defendant to an increased maximum sentence and a fact that exposes a defendant to an increased mandatory minimum sentence. See *Alleyne*, 133 S. Ct. at 2160 ("the principle applied in *Apprendi* applies with equal force to facts in-

creasing the mandatory minimum"). For Sixth Amendment purposes, both types of facts are now "elements" that must be submitted to a jury and proved beyond a reasonable doubt. *Alleyne*, 133 S. Ct. at 2158, 2160.

Despite this seemingly straightforward application of *Ring* and *Alleyne*, the State points to two sentences from *Alleyne* to suggest that under Kansas' hard 50 scheme, the aggravating factors found by the judge merely "inform judicial factfinding." Specifically, the State points out that after concluding facts necessary to increase a mandatory minimum sentence must be found by a jury beyond a reasonable doubt, the *Alleyne* Court noted: "Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. " 133 S. Ct. at 2163.

We are not persuaded that the *Alleyne* Court intended this statement to undermine its holding that the facts necessary to increase the mandatory minimum punishment must be found by a jury beyond a reasonable doubt. Instead, the cases cited immediately following the Court's comment simply clarify that *Alleyne*'s holding does not implicate judicial factfinding *within* a legislatively established sentencing range. See *Alleyne*, 133 S. Ct. at 2163 (citing cases that discuss the exercise of judicial discretion within an established sentencing range and noting: "Our decision today is wholly consistent with the broad discretion of judges to select a sentence *within the range authorized by law*." [Emphasis added.]).

Thus, we interpret the Court's comments in *Alleyne* to refer to judicial factfinding and the exercise of judicial discretion when imposing, for example, an aggravated presumptive sentence under the Kansas Sentencing Guidelines Act, K.S.A. 21-4701 *et seq*. In that circumstance, judicial factfinding increases neither the floor nor the ceiling of the statutorily authorized sentencing range; instead, it merely informs judicial discretion to sentence within that range. In contrast, Kansas' hard 50 scheme undeniably and appreciably increases the mandatory punishment imposed for first-degree premeditated murder from 25 years' imprisonment to 50 years' imprisonment.

We conclude that under the combined force of *Ring* and *Alleyne*, the statutory procedure for imposing a hard 50 sentence violates the Sixth Amendment because it permits a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt.

Because Soto's hard 50 sentence violated his Sixth Amendment right to a jury trial as interpreted in *Ring* and *Alleyne*, we vacate his sentence.

## *Remedy on Remand*

Having vacated Soto's sentence based on the unconstitutionality of the hard 50 scheme, we now turn to the parties' arguments regarding the appropriate action on remand.

Soto urges us to remand for imposition of a hard 25 sentence because that is the only sentence supported by the jury's verdict, while the State urges us to remand to the district court for resentencing under the amended hard 50 statute enacted by the legislature following *Alleyne*. See K.S.A. 2013 Supp. 21-6620. Soto responds that retroactive application of the amended statute would violate the constitutional prohibition against ex post facto laws, while the State disagrees and argues the Ex Post Facto Clause is not implicated because the new statute does not alter the definition of criminal conduct or increase the potential criminal penalty beyond that in place when Soto committed the crime.

### 1. *Consideration of harmless error review*

Because an *Alleyne* error is also an *Apprendi* error and this court has recognized that an *Apprendi* error may be subject to harmless error review, we asked the parties to brief whether a harmless error analysis can be applied in the hard 50 context. See, *e.g.*, *Washington v. Recuenco*, 548 U.S. 212, 222, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (concluding the "[f]ailure to submit a sentencing factor to the jury, like [the] failure to submit an element to the jury, is not structural error," rather it is subject to review for harmless error under the framework set out in *Neder v. United States*,

527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 [1999]); *State v. Reyna*, 290 Kan. 666, 681-82, 234 P.3d 761 (2010) (applying *Neder* framework to find *Apprendi*-type error harmless), *cert. denied* 131 S. Ct. 532 (2010); *State v. Daniels*, 278 Kan. 53, 64-65, 91 P.3d 1147 (noting decisions of United States Supreme Court have clarified that *Apprendi* errors are subject to harmless error review), *cert. denied* 543 U.S. 982 (2004). Thus, before considering the parties' arguments regarding remand, we first address harmless error, which, if it applies, would moot the remand issue.

Soto argues that a hard 50 sentencing error is not subject to harmless error review because the court applied a preponderance of the evidence standard when considering the existence of aggravated circumstances, and the findings of fact were never found beyond a reasonable doubt, as *Alleyne* requires. See *State v. Spain*, 263 Kan. 708, 714, 953 P.2d 1004 (1998) (concluding that although K.S.A. 21-4635(c) specifies no particular standard of proof, statute implicitly requires judge to apply preponderance of evidence standard when finding aggravating circumstances); see also *State v. Nelson*, 291 Kan. 475, 487-88, 243 P.3d 343 (2010) (clarifying standard of proof for finding aggravating circumstances is preponderance of evidence rather than beyond reasonable doubt). Alternatively, if harmless error review applies, Soto urges this court to conclude the *Alleyne* error was not harmless because we cannot find beyond a reasonable doubt that the evidence of the aggravating circumstance is both overwhelming and uncontested.

Citing *Reyna*, 290 Kan. at 681, the State contends this court can apply a harmless error review to the omission of an element from the jury instruction and, therefore, it can apply a harmless error review in the hard 50 context to the failure of a jury to decide an aggravating circumstance, which *Alleyne* holds is an "element" rather than a sentencing factor. The State further maintains that this review results in a conclusion beyond a reasonable doubt that the omitted element (*i.e.*, the aggravating circumstance at issue here, K.S.A. 21-4636[f]), was supported by overwhelming evidence such that the jury verdict would have been the same absent the error.

In *Reyna*, a jury convicted the defendant of multiple counts of aggravated indecent liberties with a child and the district court sentenced him, under Jessica's Law, to a term of life imprisonment with no possibility of parole for 25 years. On appeal, Reyna argued the State's failure to allege or instruct the jury on the element of his age—an element essential to the enhanced Jessica's Law sentence—violated his Sixth Amendment right to a jury trial as interpreted in *Apprendi*. *Reyna*, 290 Kan. at 678-79. Relying in part on *Recuenco*, the *Reyna* court held:

"[T]his court will apply the harmless error analysis to the omission of an element from the instructions to the jury when a review of the evidence leads to the conclusion beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error. And *Recuenco* stands for the proposition that characterizing the omission as an *Apprendi*-type error, *i.e.*, judicial factfinding of the omitted element when that element enhances the maximum applicable sentence, does not change that analysis." *Reyna*, 290 Kan. at 681.

The *Reyna* majority eventually found the error harmless based on uncontroverted and overwhelming evidence of the material element, *i.e.*, Reyna testified he was 37 years old. See *Reyna*, 290 Kan. at 682 (relying on framework partially articulated in *Neder*).

Ultimately, we conclude we need not decide here whether a harmlessness analysis applies to a hard 50/*Alleyne* error, because even assuming the application of *Reyna*'s modified harmless error analysis, the error here does not come close to meeting that test.

First, we would have to determine beyond a reasonable doubt that the evidence Soto "committed the crime in an especially heinous, atrocious or cruel manner," K.S.A. 21-4636(f), was uncontroverted and supported by overwhelming evidence such that a jury would have found the existence of the aggravating circumstance beyond a reasonable doubt. See K.S.A. 21-4635(c). See also *Reyna*, 290 Kan. at 681; *Neder*, 527 U.S. at 17 ("[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.").

Assuming we moved beyond this difficult standard, application of the second step of the analysis in the *Alleyne*/hard 50 context would require us to conclude beyond a reasonable doubt that no rational jury would have determined that any mitigating circumstances outweighed any aggravating circumstances. See K.S.A. 21-4635(d); see also *State v. Ring*, 204 Ariz. 534, 565, 65 P.3d 915 (2003) (concluding that because Arizona's capital sentencing scheme required weighing of mitigating circumstances, court would affirm capital sentence only if it could conclude, "beyond a reasonable doubt, that no rational trier of fact would determine that the mitigating circumstances were sufficiently substantial to call for leniency").

Here, Soto presented evidence regarding several mitigating circumstances including: He was only 16 at the time of the crime; his juvenile record demonstrated his amenability to rehabilitation; he lacked a significant criminal history or school discipline record; the killing was motivated by peer pressure and a gang mentality; and his accomplices received lesser sentences. Additionally, Soto's mother testified Soto was bullied in middle school; he was a good son who helped around the house; he was a good student; his father was an alcoholic; and Soto witnessed his father's abusive behavior toward Soto's mother. Although the district court found only one mitigating circumstance—Soto's age—we cannot conclude, beyond a reasonable doubt, that no rational jury would have determined Soto's age to be the only mitigating circumstance. Nor can we say that no rational jury would have determined that the mitigating circumstance outweighed the aggravating circumstance.

Finally, we note that because Kansas' hard 50 scheme requires the sentencing court to not only find aggravating and mitigating circumstances, but to weigh any mitigating circumstances against aggravating circumstances, only in a rare instance could a hard 50/*Alleyne* error be harmless. See Marceau, *Arizona's Ring Cycle*, 44 Ariz. St. L.J. 1061, 1078-80 (2012) (noting that of 30 capital sentences reconsidered by Arizona Supreme Court after *Ring*, the court affirmed only two sentences under harmless error rule and in both cases, "the deaths were unusually brutal or the corpse mutilation unusually heinous, and the mitigation in both cases was

either waived by the defendant at sentencing or deemed to be truly de minimis"). Accordingly, we will defer any decision as to whether a modified harmless error standard can apply to a hard 50 error until a case presents itself in which the evidence approaches meeting this exacting test.

*2. We decline to issue an advisory opinion as to the appropriate course of action on remand.*

Because this case must be remanded for resentencing, we now turn to Soto's arguments regarding the procedure to be applied on remand. Soto argues the district court on remand must impose a hard 25 sentence because that is the only sentence supported by the jury's verdict. However, the State argues the district court must resentence Soto under the amended hard 50 statute enacted by the legislature following *Alleyne.* See K.S.A. 2013 Supp. 21-6620.

Following *Alleyne,* the Kansas Legislature held a special session in September 2013 to amend Kansas' hard 50 sentencing scheme. See L. 2013, ch. 1, § 1 (Special Session). The amended version includes express provisions for retroactive application. K.S.A. 2013 Supp. 21-6620. Specifically, K.S.A. 2013 Supp. 21-6620(e) provides:

"[F]or all cases on appeal on or after the effective date of this act, if a sentence imposed under . . . K.S.A. 21-4635, prior to its repeal, is vacated for any reason other than sufficiency of the evidence as to all aggravating circumstances, resentencing shall be required under this section, as amended by this act, unless the prosecuting attorney chooses not to pursue such a sentence."

Soto argues retroactive application of the amended hard 50 statute would violate the constitutional prohibition against ex post facto laws. Citing *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977), the State counters that resentencing would not implicate the Ex Post Facto Clause because the new statute neither alters the definition of criminal conduct nor increases the potential criminal penalty beyond that in place when Soto committed the crime.

Both parties concede that their arguments related to the constitutionality of applying the amended hard 50 statute on remand are not ripe because the State has not yet sought application of the

amended hard 50 statute. We agree, and thus we decline the parties' invitation to issue an advisory opinion on these issues. See *State v. Montgomery*, 295 Kan. 837, Syl. ¶ 2, 286 P.3d 866 (2012) (noting that Kansas appellate courts generally do not render advisory opinions); *State v. Burnett*, 293 Kan. 840, 850, 270 P.3d 1115 (2012) (declining to issue advisory opinion on double jeopardy issue that was not yet ripe).

Instead, we hold only that because Soto's sentence was imposed in violation of his Sixth Amendment right to a jury trial, his sentence must be vacated and the case remanded for resentencing. Our decision does not foreclose the parties from presenting their arguments regarding application of the amended statute to the district court at resentencing.

3. *The evidence was sufficient to support the aggravating circumstance.*

In the event the district court were to determine the amended statute applies at resentencing, section (e) of K.S.A. 2013 Supp. 21-6620 suggests the State would be precluded from pursuing a hard 50 sentence if this court had vacated Soto's sentence for lack of sufficient evidence to support the aggravating circumstance. While we decline to decide at this juncture whether Soto could be resentenced under the amended hard 50 statute, we find it prudent to address Soto's claim that the evidence of the aggravating circumstance was insufficient.

In the past, when a criminal defendant has challenged the sufficiency of the evidence to support a hard 50 aggravating circumstance, we have considered whether, after review of all the evidence in a light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence. See, *e.g.*, *State v. McCaslin*, 291 Kan. 697, 727, 245 P.3d 1030 (2011). However, in light of *Alleyne*, we will apply the beyond a reasonable doubt standard of proof in considering the sufficiency challenge.

The cause and manner of Moreno's death was undisputed at trial; Moreno bled to death from dozens of stab wounds. More specifically, Soto, either acting alone or with his accomplices, at-

tacked Moreno with one or more knives, cutting Moreno's jugular veins on both sides of his neck, slashing one of his carotid arteries, penetrating his thyroid cartilage, and significantly damaging several internal organs. All together, the attacker(s) inflicted 79 stab wounds and cuts. As the district court noted, even if the stabbing lasted only one minute, the number of stab wounds demonstrated the savagery of the attack because the wounds would have had to have been inflicted at a rate exceeding one wound per second. *Cf. State v. Engelhardt*, 280 Kan. 113, 143-44, 119 P.3d 1148 (2005) (affirming district court's preponderance of evidence finding that defendant committed murder in heinous, atrocious, and cruel manner when victim was stabbed approximately 55 times over course of 20 minutes and defendant bragged to his friends about victim's slow death).

Viewing this evidence in the light most favorable to the prosecution, we conclude that a rational factfinder could have found, beyond a reasonable doubt, that Soto committed the murder in an especially heinous, atrocious, or cruel manner. Consequently, the sole reason we are vacating Soto's sentence is because it was imposed in violation of his Sixth Amendment right to a jury trial, as interpreted in *Alleyne*.

Finally, because we are vacating Soto's sentence, we decline to consider Soto's claim that a hard 50 sentence violates the Eighth Amendment to the United States Constitution, either as a matter of law based on his juvenile status or as applied in this case. See *State v. Jones*, 293 Kan. 757, 762, 268 P.3d 491 (2012) (declining to reach Eighth Amendment challenge to lifetime postrelease supervision because court vacated defendant's sentence on other grounds).

Affirmed in part, vacated in part, and remanded for resentencing.