NOT DESIGNATED FOR PUBLICATION

No. 114,435

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEFFREY NELSON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from McPherson District Court; RICHARD B. WALKER, judge. Opinion filed February 3, 2017. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Jamie L. Karasek*, deputy county attorney, and *Derek Schmidt*, county attorney, for appellee.

Before POWELL, P.J., PIERRON and HILL, JJ.

PIERRON, J.: Jeffrey Nelson was convicted of first-degree premeditated murder, burglary, and three counts of forgery. The district court sentenced him to a mandatory minimum of 50 years in prison (hard 50). Ninety-six days after the Kansas Supreme Court upheld his hard 50 sentence, the United States Supreme Court issued *Alleyne v. United States*, 570 U.S. __, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), which ruled sentences such as Kansas' hard 50 sentencing scheme were unconstitutional. Nelson filed a motion pursuant to K.S.A. 60-1507 claiming his trial counsel was ineffective and his appellate counsel was ineffective for failing to file a writ of certiorari to the United States

1

Supreme Court which he claims would have secured him relief under *Alleyne*. The district court denied his motion after an evidentiary ruling. Nelson appeals.

On April 25, 2008, a jury convicted Nelson of first-degree murder, burglary, and three counts of forgery. Our Supreme Court affirmed his convictions on appeal in *State v. Nelson*, 291 Kan. 475, 476, 243 P.3d 343 (2010) (*Nelson I*). The following facts are taken directly from the Supreme Court's opinion in *Nelson I*:

"The relevant events occurred over a 3-day time span. On August 24, 2007, Nelson went to the house of his stepfather Swartz, just as Swartz was getting ready to leave for work. Swartz indicated Nelson was not welcome and waited for Nelson to leave before going to work. Nelson returned while Swartz was at work and broke into the garage. Nelson used a ladder to crawl through an attic space connecting the garage to the house because the garage did not have direct access to the house. Once inside the attic space, the ceiling buckled and Nelson fell through, creating a hole. When Swartz returned home after work, Nelson was gone. Swartz reported the break-in to police and said his checkbook was missing.

"At 9:38 p.m. that same day, Nelson used an ATM to deposit a $5,000 forged check from Swartz' account. Nelson then picked up his friend, Keith Hewitt. They drove to Wal-Mart, and Nelson bought a baseball bat. As they were leaving the parking lot, Nelson asked Hewitt if he would help him beat up Swartz. Hewitt testified at trial that he talked Nelson out of this. The two then went to a club. Nelson took Hewitt home at 2 a.m., but Nelson returned at 3 a.m. and offered Hewitt $500 to help him 'take care of' Swartz. Hewitt refused.

"The next day, April 25, 2007, Nelson and Swartz had a chance encounter at Wal-Mart that became heated, but not physical. Sometime later that day Nelson deposited a $100 forged check from Swartz' account into his friend Misty Sauder's account. At around 10 p.m. Nelson asked Amber Moore, a girl he was dating, if she wanted to watch a movie. Moore picked Nelson up at his grandparents' house; he asked her if she would think poorly of him if he beat someone up; and then he asked her to drive him by Swartz' employer to see if his truck was in the parking lot. It was. Nelson then asked Moore to drive him back to his grandparents' house where he retrieved the bat. He told Moore he needed the bat for protection because he was going to beat up Swartz.

"Moore and Nelson drove by Swartz' workplace again to make sure Swartz' truck was still there, and then Moore dropped Nelson off at Swartz' house. He told Moore to tell him when Swartz was driving home. Swartz returned home around 11 p.m. Moore believed Nelson was hiding in the bushes. She drove around until 1 a.m., when she told Nelson she was going home. She testified Nelson told her he 'could not do it,' and they went back to Moore's house. At around 2:30 a.m., Nelson borrowed Moore's car, took the baseball bat, and said he was returning to Swartz' home.

"Nelson disputes what happened next. The State contends Nelson entered the home, discovered Swartz sleeping in his bed, and hit him on the back of the head while he slept. The coroner testified Swartz' death was caused by a blunt force trauma to the head, and there were no defensive wounds. A detective testified there was no evidence of a struggle in the home. Nelson's defense theory was that Swartz let him into his house, they fought, Nelson tried to leave, and Swartz pulled him back into a fight. Finally, Nelson grabbed the bat, Swartz reached for it, and Nelson hit him with it. This defense theory is based on varying statements Nelson gave the police. Nelson did not testify at trial.

"Initially, Nelson told a detective he got into a fight with Swartz between 11:30 and 11:45 p.m. on April 25. He said they fought over the bat and he hit Swartz with it. He said Swartz was fine when he left. Nelson later added greater and sometimes conflicting details about the physical altercation. This portion of the interview is more difficult to follow, but begins with Nelson saying that he went into a room in Swartz' house and found the bat. Swartz was standing in the room's doorway. Nelson chopped at Swartz with the bat, and Swartz backed into his bedroom. Swartz antagonized Nelson by saying he had better hit him hard, and Nelson told Swartz not to give him an excuse. Nelson then approached Swartz, and Swartz reached for the bat, eventually catching it. Nelson pushed Swartz, and he 'finally' hit Swartz several times with the bat. He said Swartz ended up on the bed, lying on his back and side. Nelson told the detective he went to Swartz' house to 'fucking end the animosity and all the bullshit and all the shit [Swartz] was doing.'

"Later in the same interview, after additional prodding from the detective, Nelson said he was going to tell the truth about what happened. Nelson admitted he brought the bat with him and did not find it in a room in Swartz' house. At some point, Nelson told a detective it was kind of hard to walk around the corner, look in the bathroom, and close the door while holding the bat without it being obvious. Then Nelson said Swartz asked if he was hiding something, and Nelson tried to 'play it off like I wasn't doing anything.'

3

Nelson grabbed the door handle and pulled it. Swartz pushed him twice and slapped him on the head. Then Nelson said he pushed him back, pulled out the bat, and hit him. Nelson continually stated there was no blood when he left.

"Moore testified at trial that Nelson returned to her house around 6:30 a.m. that morning, April 26. She said Nelson was pale and told her he thought he killed Swartz. Later that day, Swartz was discovered on his couch by a coworker when Swartz did not show up for work. Swartz was alive but unresponsive. There were pools of blood on Swartz' bed, pillow, and in the master bedroom; blood was found going from the bedroom, down the hallway, and in the bathroom; and there were sheets that trailed blood through the house to the couch.

"Also that day, Nelson deposited a $400 forged check from Swartz' account. Nelson then dropped off an apartment rental application and test drove a BMW at a dealership. Nelson told Moore he was going to sell Swartz' vehicles for a down payment. While Nelson was occupied with the car, Moore received a phone call that Swartz had been taken to the hospital, and everyone suspected Nelson beat him. Moore and Nelson left the dealership. Moore testified that she and Nelson retrieved the clothes Nelson was wearing at the time he hit Swartz with the bat, got the bat out of a dumpster where Nelson had stashed it, drove to the country, and discarded the items. Moore later led police back to retrieve these items.

"On May 19, 2007, Swartz died from complications arising from the head injuries. Nelson was charged with premeditated first-degree murder in case No. 07CR86. He also was charged with burglary and three counts of forgery for the checks drawn on Swartz' account in the amounts of $5,000, $100, and $400 in case No. 07CR125. The cases were consolidated for trial." 291 Kan. at 476-79.

Prior to the State charging him with premeditated murder, Nelson had retained Stephen Ariagno regarding several other cases he had pending. After his murder charge, the district court appointed Ariagno to represent Nelson in his first-degree murder case. A jury trial commenced in the present case on January 28, 2008. The next day, the court declared a mistrial at the request of Ariagno after four different jurors reported they knew witnesses in the case, but they were not aware of it at the time of jury selection. The

4

district court rescheduled the jury trial for April 21, 2008. On April 25, 2008, the jury found Nelson guilty on all charges.

On June 30, 2008, the district court sentenced Nelson to life in prison with mandatory minimum sentence of 50 years (hard 50) for his first-degree murder conviction. The court ordered the burglary and forgery sentences to run consecutive to Nelson's hard 50 sentence, but concurrent with each other, for an additional term of 32 months' imprisonment. Nelson appealed his sentence to the Kansas Supreme Court, arguing, among other things, that the district court imposed the wrong standard when finding aggravating factors supported his hard 50 sentence. Our Supreme Court agreed, and remanded Nelson's hard 50 sentence to the district court to determine whether aggravating circumstances existed under a preponderance of the evidence standard. 291 Kan. at 488.

In February 2011, Ariagno informed the district court that Nelson had expressed concerns regarding his representation of Nelson during the jury trial. Ariagno believed a conflict existed based on Nelson's assertion that he was ineffective. The court granted Arigano's request to withdraw and appointed another attorney to represent Nelson at his resentencing hearing. At his resentencing hearing, the district court again sentenced Nelson to a hard 50 sentence. Nelson appealed his sentence, arguing the court abused its discretion in imposing the hard 50 sentence. *State v. Nelson*, 296 Kan. 692, 294 P.3d 323 (2013) (*Nelson II*).

After both parties had filed briefs in Nelson's second appeal, the United States Supreme Court granted certiorari in *Alleyne v. United States*, 570 U.S. __, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), on October 5, 2012. The Kansas Supreme Court issued an opinion affirming Nelson's sentence on February 15, 2013. *Nelson II*, 296 Kan. 692. A mandate was issued finalizing the decision on March 11, 2013. The United States Supreme Court decided *Alleyne* 96 days later on June 17, 2013.

5

On December 24, 2013, Nelson filed a K.S.A. 60-1507 motion alleging that both his trial counsel, Ariagno, and his appellate counsel, Meryl Carver-Allmond were ineffective. After reviewing the motion, the district court ordered an evidentiary hearing on the matter. Additionally, on February 18, 2014, the Paul E. Wilson Project for Innocence & Post-Conviction Remedies submitted a supplemental brief supporting Nelson's claim that his appellate counsel was ineffective. Attached to this brief were an affidavit from Carver-Allmond and two blog posts regarding *Alleyne* that she claimed she had read before the Kansas Supreme Court issued its ruling in *Nelson II*. On September 8, 2014, the district court held an evidentiary hearing on Nelson's 60-1507 motion. On June 8, 2015, the court filed a journal entry finding that neither Ariagno nor Carver-Allmond were ineffective. The court later filed a corrected journal entry to correct grammatical and spelling mistakes, but the substance of the decision was the same. Nelson appeals.

Carver-Allmond represented Nelson on his initial appeal and the appeal of his resentencing, and she testified at the evidentiary hearing. Carver-Allmond did not raise the hard 50 sentencing issue on Nelson's first appeal. She said she believed the hard 50 sentencing issue was "effectively dead" at the time of Nelson's appeal because the Kansas Supreme Court had routinely denied the issue for years. On the appeal of Nelson's resentencing, she believed she could not raise the issue because the appeal was limited to issues regarding Nelson's resentencing. Additionally, the United States Supreme Court had not granted certiorari for *Alleyne* at that time.

Carver-Allmond testified that the decision in *Alleyne* came down after the Kansas Supreme Court issued the mandate in Nelson's second appeal. The *Alleyne* decision also came down after the 90 days Nelson had to file his writ of certiorari. Another attorney at the appellate defender's office, Randall Hodgkinson, told Carver-Allmond that the United States Supreme Court had granted certiorari in the *Alleyne* case, and he thought the law was likely to change. She also read blog posts by Hodgkinson regarding the grant of

certiorari in *Alleyne*. At the time, though, Carver-Allmond had just started a position as a public defender for capital cases and was overwhelmed with her new workload. She also suspected Hodgkinson's enthusiasm may have been more because he was hoping the law would change and not because the law was actually likely to change.

Carver-Allmond testified she did not discuss filing a writ of certiorari with Nelson. Carver-Allmond stated she does not commonly discuss filing writs of certiorari with her clients. She felt in this case, however, she was ineffective for failing to file for a writ. She also testified she made a mistake by not investigating the issue more, and her failure to do so was not a strategic call.

Nelson testified he did not discuss filing a writ of certiorari to the United States Supreme Court with Carver-Allmond. He said that if he had known that was a possibility, he would have wanted to file one.

The district court concluded that Carver-Allmond had not provided ineffective assistance of appellate counsel. The court noted that if *Alleyne* had been decided at the time of Nelson's jury trial, the decision of whether a hard 50 sentence should be imposed would certainly have been an issue for the jury and not the district court. The court found, however, that United States Supreme Court and other federal caselaw clearly established there was no constitutional right to counsel to file a writ of certiorari.

The district court also noted that in *Kargus v. State*, 284 Kan. 908, 916, 169 P.3d 307 (2007), the Kansas Supreme Court held there was a statutory right to effective assistance of counsel in discretionary appeals to the Kansas Supreme Court. The district court added, however, that this holding was limited to the state appellate process. Unless Kansas courts decided to extend that right to filing for certiorari, the prior cases finding no constitutional right to effective assistance of counsel at that stage controlled. The court further found that because *Alleyne* had not been decided at the time of Nelson's appeals,

7

Carver-Allmond could not be faulted for failing to raise the issue of the constitutionality of Nelson's Hard 50 sentence.

*Standard of Review*

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2015 Kan. Ct. R. Annot. 271). An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013).

*Overview of Hard 50 Sentencing Issue*

The district court sentenced Nelson under Kansas' hard 50 sentencing scheme. As explained in *Nelson I*,

> "Premeditated first-degree murder carries a life sentence with a mandatory minimum of 25 years before the defendant becomes eligible for parole unless the court finds the defendant should be subject to an enhanced minimum sentence. For crimes committed after July 1, 1999, this requires a mandatory hard 50 term. K.S.A. 21–4635; see K.S.A. 22–3717(b)(1). To impose the hard 50 sentence, the district court must find one or more of the aggravated circumstances enumerated in K.S.A. 21–4636 exist and that the aggravating factors are not outweighed by any mitigating factors. K.S.A. 21–4635(d)." 291 Kan. at 486.

As the Kansas Supreme Court pointed out in *State v. Soto*, 299 Kan. 102, 119, 322 P.3d 334 (2014):

"[B]efore *Alleyne*, the United States Supreme Court held that any additional facts necessary to increase the punishment for a crime beyond the maximum punishment a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant must be submitted to a jury and proven beyond a reasonable doubt. In contrast, additional facts necessary to increase the mandatory minimum sentence were merely sentencing factors that could be found by a judge rather than a jury."

Based on this distinction, the *Soto* court upheld the constitutionality of the hard 40 sentencing scheme (later amended to a hard 50 scheme) even in light of the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). See 299 Kan. at 119.

In *Alleyne*, however, the United States Supreme Court changed course and held because "[m]andatory minimum sentences increase the penalty for a crime . . . any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury," explicitly overruling prior precedent that held otherwise. 133 S. Ct. at 2155. In *Soto*, the Kansas Supreme Court applied *Alleyne* to the hard 50 sentencing scheme and found it unconstitutional. 299 Kan. at 124. Several defendants who had cases pending on appeal had their hard 50 sentences ruled unconstitutional. See, *e.g.*, *State v. Lloyd,* 299 Kan. 620, 626, 641, 325 P.3d 1122 (2014); *State v. DeAnda*, 299 Kan. 594, 600, 324 P.3d 1115 (2014); *State v. Hilt*, 299 Kan. 176, 201-04, 322 P.3d 367 (2014). This court has held, however, that *Alleyne* does not apply retroactively. *Verge v. State*, 50 Kan. App. 2d 591, 598, 335 P.3d 679 (2014).

*Right to Counsel for a Writ of Certiorari*

In order to find that Carver-Allmond was ineffective for failing to file a petition for certiorari with the United States Supreme Court, Nelson must first have had a right to effective assistance of counsel at this stage of the proceedings. See, *e.g.*, *Wainwright v. Torna*, 455 U.S. 586, 587-88, 102 S. Ct. 1300, 71 L. Ed. 2d 475 (1982) (since defendant

had no constitutional right to counsel to file a discretionary appeal with state supreme court, defendant could not be deprived of effective assistance of counsel by his counsel's failure to timely file a petition for review). Nelson argues that both the Kansas Constitution and Kansas statutes provide a right to effective assistance of counsel in filing a writ of certiorari to the United States Supreme Court.

*Constitutional Right*

The Sixth Amendment provides a right to counsel at trial in criminal prosecutions. U.S. Const. amend. VI. The United States Supreme Court has further held that under the Due Process and Equal Protection clauses of the Fourteenth Amendment defendants are entitled to effective assistance of counsel for their first appeal. See *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985) (finding defendant must be provided with effective assistance of counsel on first appeal to comply with due process of law); *Douglas v. California*, 372 U.S. 353, 357-58, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963) (finding under equal protection clause that State must provide counsel to indigent defendants on first appeal); *Griffin v. Illinois*, 351 U.S. 12, 18-19, 76 S. Ct. 585, 100 L. Ed. 891 (1956) (finding under due process and equal protection clauses that State which has created appellate review system must provide meaningful means of review to all defendants). As Nelson admits in his brief, the United States Supreme Court does not recognize a federal constitutional right to counsel for discretionary appeals at the state level or to file a writ of certiorari to the United States Supreme Court. See *Wainwright*, 455 U.S. at 587-88; *Ross v. Moffitt*, 417 U.S. 600, 616-18, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974). In *Foy v. State*, 17 Kan. App. 2d 775, 844 P.2d 744 (1993), another panel of this court adopted the ruling in *Wainwright* to find there was no constitutional right to state discretionary appeals in Kansas. 17 Kan. App. 2d. at 776.

10

Nelson argues that section 10 and section 18 of the Kansas Constitution Bill of Rights provide a right to counsel for writs of certiorari to the United States Supreme Court. Section 10 provides:

> "In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel; to demand the nature and cause of the accusation against him; to meet the witness face to face, and to have compulsory process to compel the attendance of the witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed. No person shall be a witness against himself, or be twice put in jeopardy for the same offense."

Section 18 provides: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

Nelson's argument regarding this point is not entirely clear. He argues that "[t]he Kansas legislature has in essence constitutionalized the scope of a criminal prosecution under Section 10 and defined 'due course of law' under Section 18 by granting appellate review of criminal proceedings." He states that a defendant has a right to a direct appeal and a discretionary appeal to the Kansas Supreme Court. He then notes that "[w]hether the Kansas Supreme Court reviews the case is discretionary with the Court. At that point, *the criminal proceedings against the individual have concluded*." (Emphasis added.) He then goes on to explain that Kansas recognizes a general right to effective assistance of counsel and argues this includes discretionary appeals to the Kansas Supreme Court. At no point, though, does Nelson explain how these rights demonstrate a right to effective assistance of counsel for a writ of certiorari to the United States Supreme Court. In fact, he concedes that criminal proceedings against a defendant finish after review by the Kansas Supreme Court.

Regardless of Nelson's argument, the Kansas Constitution does not appear to recognize a right to effective assistance of counsel for writs of certiorari. Kansas courts

11

generally interpret the Kansas Bill of Rights as providing the same or similar protections as the Bill of Rights in the United States Constitution. See *State v. Schoonover*, 281 Kan. 453, 493, 133 P.3d 48 (2006) ("Generally, provisions of the Kansas Constitution which are similar to the Constitution of the United States have been applied in a similar manner."). The Kansas Supreme Court has interpreted section 10 of the Kansas Constitution Bill of Rights as providing the same protections as the Fifth and Sixth Amendments to the United States Constitution. See, *e.g.*, *Schoonover*, 281 Kan. at 474 (section 10 and Fifth Amendment provide same protections against double jeopardy); *State v. Davis*, 277 Kan. 309, 334, 85 P.3d 1164 (2004) (interpreting Sixth Amendment and section 10 as providing same guarantees to speedy trial); *State v. Morris*, 255 Kan. 964, 979-81, 880 P.2d 1244 (1994) (section 10 provides no greater protection against self-incrimination than Fifth Amendment). Kansas courts also interpret sections 1 and 2 of the Kansas Constitution Bill of Rights as providing similar protections as the Due Process Clause and Equal Protection Clauses of the United States Constitution. See *Hodes & Nauser, MDs v. Schmidt*, 52 Kan. App. 2d 274, 275, 368 P.3d 667, *rev. granted* 304 Kan. 1017 (2016). As the United States Supreme Court has held there is no right to effective assistance of counsel for filing a writ of certiorari under the Sixth Amendment or Due Process and Equal Protection Clauses, there is likely no right under the Kansas Constitution. See *Kargus*, 284 Kan. at 912 (noting no constitutional right to discretionary state appeals).

Additionally, there is little caselaw interpreting section 18 of the Kansas Constitution Bill of Rights. In *Ware v. State*, 198 Kan. 523, 426 P.2d 78 (1967), however, our Supreme Court held that Art. 3 of the Kansas Constitution and sections 5, 10, and 18 of the Kansas Constitution Bill of Rights do not give rise to a right to appeal. 198 Kan. at 525. Thus, section 18 is unlikely to have "constitutionalized the scope of a criminal proceeding" and given rise to a constitutional right to counsel in filing a writ of certiorari, as Nelson argues.

*Statutory Right*

Next, Nelson contends there is a statutory right to effective assistance of counsel for writs of certiorari. The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Jordan,* 303 Kan. 1017, 1019, 370 P.3d 417 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. 303 Kan. at 813. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the legislature's intent. 303 Kan. at 813.

Nelson's argument that there is a statutory right to counsel for writs of certiorari is based solely on the language of K.S.A. 22-4505(a)-(c), which provides:

"(a) When a defendant has been convicted in the district court of any felony, the court shall inform the defendant of such defendant's right to appeal the conviction to the appellate court having jurisdiction and that if the defendant is financially unable to pay the costs of such appeal such defendant may request the court to appoint an attorney to represent the defendant on appeal and to direct that the defendant be supplied with a transcript of the trial record.

"(b) If the defendant files an affidavit stating that the defendant intends to take an appeal in the case and if the court determines, as provided in K.S.A. 22-4504, and amendments thereto, that the defendant is not financially able to employ counsel, the court shall appoint counsel from the panel for indigents' defense services or otherwise in accordance with the applicable system for providing legal defense services for indigent persons prescribed by the state board of indigents' defense services, to represent the defendant and to perfect and handle the appeal. If the defendant files a verified motion for

13

transcript stating that a transcript of the trial record is necessary to enable the defendant to prosecute the appeal and that the defendant is not financially able to pay the cost of procuring such transcript, and if the court finds that the statements contained therein are true, the court shall order that such transcript be supplied to the defendant as provided in K.S.A. 22-4509, and amendments thereto and paid for by the state board of indigents' defense services pursuant to claims submitted therefor.

"(c) Upon an appeal or petition for certiorari addressed to the supreme court of the United States, if the defendant is without means to pay the cost of making and forwarding the necessary records, the supreme court of Kansas may by order provide for the furnishing of necessary records."

Nelson argues that because this statute contains no restrictions on the scope of the appeal, the legislature clearly intended to include writs of certiorari to the United States Supreme Court

Of particular relevance on this point is *Kargus*, in which the court found a statutory right to discretionary appeals to the Kansas Supreme Court. 284 Kan. at 916. Kargus filed a K.S.A. 60-1507 motion alleging his attorney had provided ineffective assistance of counsel because his counsel failed to file a petition for review with the Kansas Supreme Court despite Kargus' request that he do so. In determining whether Kargus' counsel was ineffective, the court first considered whether Kargus had a right to effective assistance of counsel in filing a petition for review. The court noted that precedent established there was no constitutional right to counsel for discretionary state appeals. 284 Kan. at 911-13 (citing *Foy*, 17 Kan. App. 2d at 775-76). The court added, however, that even if there was no constitutional right to counsel, there could be a statutory right to counsel at this stage of the proceedings. *Kargus*, 284 Kan. at 913.

The *Kargus* court considered several statutes governing the criminal appeals process: K.S.A. 20-3018, K.S.A. 22-4503, K.S.A. 22-4505, K.S.A. 22-3424, and K.S.A. 22-3602. As the court stated:

14

"First, K.S.A. 2006 Supp. 22-4503(a) provides that a defendant charged with a felony 'is entitled to have assistance of counsel at *every stage* of the proceedings against such defendant.' (Emphasis added.) K.S.A. 2006 Supp. 22-4505(b) makes it clear that this reference includes the right of indigent defendants to have the assistance of appointed counsel during a direct appeal. That statute directs that, after determining a felony defendant is not financially able to employ counsel, 'the court shall appoint counsel from the panel for indigents' defense services or otherwise in accordance with the applicable system for providing legal defense services for indigent persons prescribed by the state board of indigents' defense services, to represent the defendant *and to perfect and handle the appeal*.' (Emphasis added.) K.S.A. 2006 Supp. 22-4505(b). Several other statutory provisions reference a defendant's right to appeal and the right to have appointed counsel, some in the context of imposing a duty upon the trial court to inform the defendant of those rights. See, *e.g.*, K.S.A. 22-3424(f) ('After imposing sentence in a case which has gone to trial on a plea of not guilty, the court shall advise the defendant of the defendant's right to appeal and of the right of a person who is unable to pay the costs of an appeal to appeal in *forma pauperis* '); K.S.A. 2006 Supp. 22-4505(a) (trial court 'shall inform the defendant of such defendant's right to appeal the conviction to the appellate court having jurisdiction and that if the defendant is financially unable to pay the costs of such appeal,' the defendant may request appointed counsel)." 284 Kan. at 914-15.

The *Kargus* court noted these provisions did not explicitly mention petitions for review, so a question still remained whether the legislature intended to provide a right to counsel for petitions for review "when it granted the right to counsel during 'every stage of the proceedings,' . . . and required judges to appoint counsel to 'handle the appeal' for indigent defendants." 284 Kan. at 915. To answer this question, the court next looked to K.S.A. 20-3018(b) "which states that, when the Court of Appeals has initial jurisdiction, '[a]ny party aggrieved by a decision' of that court 'may petition the supreme court for review within thirty (30) days after the date of such decision.'" 284 Kan. at 915. The court noted that while the grant of a petition for review was discretionary with the court, this statute demonstrated the right to *file* a petition was unqualified, and it is a right which is a

part of the appeal and one of the stages of the proceedings to which the right to counsel attaches. 284 Kan. at 915.

The *Kargus* court further noted that construing these statutes to find there was no right to counsel in filing a petition for review would lead to unreasonable results. For one, an indigent defendant would be left to pursue his or her case pro se in the Kansas Supreme Court. If the State sought review in the Supreme Court, the defendant would again be left to argue pro se before the court. "Clearly, however, the State's continuation of the appellate process would be a continuation of proceedings against the defendant." 284 Kan. at 915. The court also noted the legislature also intended indigent defendants to have a right to counsel when the Kansas Supreme Court *grants* a petition for review, so it would be illogical for the legislature not to provide a right to counsel to *file* for a petition for review. 284 Kan. at 916.

The holding in *Kargus* was limited to the state appellate process. 284 Kan. at 916. Nevertheless, the reasoning employed in *Kargus* to find a statutory right to counsel to file a petition for review with the Kansas Supreme Court could be extended to filing writs of certiorari in the United States Supreme Court. K.S.A. 22-4503 and K.S.A. 22-4505 provide that a defendant charged with a felony has a right to counsel at *every stage of the proceedings* against him or her, and requires judges to appoint counsel to handle the defendant's appeal. As provided in 28 U.S.C. §1257 (2012), the United States Supreme Court may review the final judgment of a state's highest court as long as it presents a question of federal law. While the grant of review is discretionary, the right to request review is unqualified as long as the case at issue presents a question of federal law. Additionally, if defendants pursuing or defending their case pro se before the Kansas Supreme Court is unreasonable, requiring them to do so before the United States Supreme Court seems even less reasonable. In fact, pro se defendants can no longer present oral argument before the United States Supreme Court. U.S. Sup. Ct. R. 28.

16

On the other hand, there are notable differences between analyzing the statutory right to counsel to file a petition for review in the Kansas Supreme Court and a writ of certiorari with the United States Supreme Court. State statute provides the right to file a petition for review with the Kansas Supreme Court, so the state created this right. In contrast, federal statute created the right to file a writ of certiorari with the United States Supreme Court. In analyzing the constitutional right to counsel for discretionary appeals, the United States Supreme Court noted the "significant difference between the source" of these rights, adding "[t]he suggestion that a State is responsible for providing counsel to one petitioning [the United States Supreme Court] simply because it initiated the prosecution which led to the judgment sought to be reviewed is unsupported by either reason or authority." *Ross*, 417 U.S. at 617.

Nelson argues in his brief that K.S.A. 22-4505(c) recognizes the right of a defendant to pursue his appeal in the United States Supreme Court. K.S.A. 22-4505(c) provides: "Upon an appeal or petition for certiorari addressed to the supreme court of the United States, if the defendant is without means to pay the cost of making and forwarding the necessary records, the supreme court of Kansas may by order provide for the furnishing of necessary records." While Nelson is correct that this subsection recognizes this right, it does not create the right. Furthermore, this subsection also indicates the Kansas Legislature distinguishes between appeals and petitions for certiorari, as they are listed separately in the statute. Subsection (c) uses the word "appeal," and the rest of K.S.A. 22-4505 does not include writs of certiorari. Therefore, even if K.S.A. 22-4505 does provide a right to effective counsel in appeals, this language does not include writs of certiorari.

Other than a brief mention of *Kargus,* the State primarily argues there is no federal constitutional right to effective assistance of counsel to file a writ of certiorari. This point is, of course, clearly established by United States Supreme Court precedent, and Nelson himself concedes it. The State does not address the Kansas constitutional argument at all.

17

In support of its argument that Nelson does not have a constitutional or statutory right to counsel, the State does discuss an Eighth Circuit case, *Walker v. United States*, 810 F.3d 568 (8th Cir. 2016). In a federal habeas petition, Walker argued her counsel was ineffective for failing to raise *Alleyne* issues in her petition for certiorari to the United States Supreme Court. Walker claimed she had a constitutional right to effective assistance of counsel for filing her writ of certiorari. The Eighth Circuit rejected her argument, noting it was contrary to Supreme Court precedent. 810 F.3d at 576. The court also rejected Walker's claim that Federal Rule of Criminal Procedure 44(a), 18 U.S.C. §3006A (2012) and the Eighth Circuit Plan to Implement the Criminal Justice Act of 1964 established a statutory right to counsel at this stage of the proceedings. 810 F.3d at 577.

While the Eighth Circuit has held that federal law does not create a statutory right to counsel to file a writ of certiorari, this is at best only persuasive authority. The case only deals with federal statutes. See Fed. R. Crim. Pro. 44(a); 18 U.S.C. §3006A. Furthermore, the Seventh Circuit has held Fed. R. Crim. Pro. 44(a) and 18 U.S.C. §3006A "make it clear that the defendant in a direct criminal appeal has the right to have the continued representation of appointed counsel throughout the course of the appeal, including the filing of post-opinion pleadings in the court of appeals and the filing of a petition for certiorari in the Supreme Court of the United States." *United States v. Howell,* 37 F.3d 1207, 1209 (7th Cir. 1994); see also *United States v. Price*, 491 F.3d 613, 615 (7th Cir. 2007) (finding defendant did not have constitutional right to seek certiorari, but did have statutory right under 18 U.S.C. §3006A). Thus, federal courts provide no clear direction on the possibility of a statutory right to counsel for filing writs of certiorari.

On the other hand, this court has addressed this issue in *Adams v. State*, No. 104,758, 2011 WL 5833481 (Kan. App. 2011) (unpublished opinion). The *Adams* court held that:

> "The Kansas Supreme Court distinguished the statutory right to counsel from the constitutional right to counsel and held that the statutory right "'extends to all levels of the *state* appellate process, including the filing of the petition for review'". . . . While the statutory right to counsel in Kansas extends to petitioning the Kansas Supreme Court for review, a petition to the United States Supreme Court is outside of the State's appellate process. Thus, Adams cannot rely on his Kansas statutory right to counsel for his claim that Cornwell was ineffective for failing to petition the United States Supreme Court for certiorari." 2011 WL 5833481, at *4.

Additionally, research did not uncover other states that provide a statutory right to counsel for writs of certiorari to the United States Supreme Court. Given the different source of the right to appeal between state discretionary appeals and writs of certiorari and the general lack of recognition of the right to effective assistance of counsel in filing writs, Nelson likely did not have a statutory right to effective assistance of counsel at this stage of the proceedings. Because Nelson did not have a right to effective assistance of counsel in filing a writ of certiorari to the United States Supreme Court, Carver-Allmond cannot be in violation of that right for failing to file a writ.

*Regulatory Right*

Nelson also argues there is a regulatory right to effective assistance of counsel. He cites to K.A.R. 105-1-1, which regulates the Kansas Board of Indigent Services. While Nelson cites authority that regulations can have the same force and effect as laws, he does not provide any support for his argument that a regulation can give rise to the right to effective assistance of counsel in criminal proceedings. Some federal cases recognize the regulatory right to counsel, but this right appears to only be recognized in administrative proceedings. See, *e.g.*, *Lamay v. Commissioner of Social Security*, 562 F.3d 503, 507 (2d Cir. 2009) (recognizing statutory and regulatory right to counsel in social security

19

disability hearings); *Campos v. Nail*, 43 F.3d 1285, 1289 (9th Cir. 1994) (aliens have statutory and regulatory right to counsel in immigration proceedings).

*Ineffective Assistance*

Even if Nelson did have a statutory right to effective assistance of counsel in filing a writ of certiorari to the United States Supreme Court, he would still need to demonstrate that Carver-Allmond's performance was ineffective. A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the district court conducts a full evidentiary hearing on such claims, this court determines whether substantial competent evidence supports the district court's findings and whether the factual findings support the court's legal conclusions; we apply a de novo standard to the district court's conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

*Failing to File Writ of Certiorari*

Normally, a defendant alleging ineffective assistance of appellate counsel must show that (1) counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness, and (2) the defendant was prejudiced to the extent that there is a reasonable probability that, but for counsel's deficient performance, the appeal would have been successful. *Miller v. State*, 298 Kan. 921, 930-31, 934, 318 P.3d 155 (2014).The failure to file a notice of appeal presents a unique situation with a unique standard.

In *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000), the United States Supreme Court addressed the proper standard for ineffective assistance of counsel in cases where counsel failed to file a notice of appeal. The court declined to adopt a standard establishing failure to file a notice of appeal as *per se* deficient

performance. Rather, the court held "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." 528 U.S. at 480. The Court then addressed whether a showing of prejudice was necessary as under the *Strickland* test. 528 U.S. at 481-84. The Court noted that failing to file an appeal presents a unique circumstance because in such cases "counsel's alleged deficient performance led not to a judicial proceedings of disputed reliability, but rather to the forfeiture of the proceeding itself." 528 U.S. at 483. Thus, in these cases, to show prejudice "a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." 528 U.S. at 484.

In *Kargus*, the Kansas Supreme Court explicitly adopted the standard established in *Flores-Ortega*. *Kargus*, 284 Kan. at 928. Specifically, the *Kargus* court recognized when a defendant claims counsel was ineffective for failing to file a discretionary appeal, Kansas courts should apply one of three standards based on the factual circumstances:

> "(1) If a defendant has requested that a petition for review be filed and the petition was not filed, the appellate attorney provided ineffective assistance; (2) a defendant who explicitly tells his or her attorney not to file a petition for review cannot later complain that, by following instructions, counsel performed deficiently; (3) in other situations, such as where counsel has not consulted with a defendant or a defendant's directions are unclear, the defendant must show (a) counsel's representation fell below an objective standard of reasonableness, considering all the circumstances; and (b) the defendant would have directed the filing of the petition for review. A defendant need not show that a different result would have been achieved but for counsel's performance." 284 Kan. at 928.

21

In the present case, the district court did not make a fact finding regarding whether Nelson requested Carver-Allmond to file a writ of certiorari or Carver-Allmond consulted with Nelson regarding filing one. Carver-Allmond testified, however, that she did not discuss filing a writ with Nelson. Nelson also testified that he did not know he could file a writ, and if he had known, he would have asked Carver-Allmond to file one.

Based on the testimony at the evidentiary hearing, however, Nelson would fall into the third category in *Kargus*; therefore, he would have to show that Carver-Allmond's representation was objectively unreasonable. Nelson is arguably unable to do this.

First, Carver-Allmond did not raise the issue of the constitutionality of Nelson's hard 50 sentence on either his first or second appeal. This means if she had filed a writ of certiorari to the United States Supreme Court, she would have been raising the issue for the first time in the writ. The United States Supreme Court has noted, however, that with few exceptions it will not address a federal claim when reviewing a state judgment unless that claim "was either addressed by, or properly presented to, the state court that rendered the decision [it has] been asked to review." *Adams v. Robertson*, 520 U.S. 83, 86, 117 S. Ct. 1028, 137 L. Ed. 2d 203 (1997). Under this rule, Nelson's writ of certiorari would have been denied. Carver-Allmond is arguably not objectively unreasonable for not consulting with her client regarding filing a writ of certiorari which almost certainly would have been denied.

In his brief, Nelson does not appear to assert a standard of review by which to determine if Carver-Allmond's representation was, in fact, ineffective. He does, however, claim she was ineffective for failing to file a writ that was being pursued by her colleagues and that would have secured relief for Nelson. Whether Nelson would have obtained relief is speculative, though. Several defendants were granted relief by the Kansas Supreme Court because their cases were pending *on appeal* when the decision in *Alleyne* came down. *State v. Lloyd*, 299 Kan. at 626; *State v. Deanda*, 299 Kan. at 600;

22

*State v. Hilt*, 299 Kan. at 201-04. In another case, *State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014), the defendant did obtain relief by filing a writ of certiorari. 299 Kan. at 396. After the decision in *Alleyne*, however, the Supreme Court granted the defendant's petition for writ of certiorari, vacated the Kansas Supreme Court's judgment, and remanded the case for reconsideration. As noted, however, the only way the United States Supreme Court would have granted Nelson certiorari is if it went against its well-established rule against considering federal claims raised for the first time in a writ. His claim for relief thus requires speculation, which this court has disfavored. See *Tomlin v. State*, 35 Kan. App. 2d 398, 406, 130 P.3d 1229 (2006) ("In Tomlin's case, . . . he asks us to engage in multiple exercises in speculation to arrive at a conclusion of prejudice. This we are not prepared to do.").

Nelson also argues it was unreasonable for Carver-Allmond not to foresee the coming change of law in *Alleyne*. In support of his argument, Nelson relies on *Laymon v. State*, 280 Kan. 430, 122 P.3d 326 (2005). In *Laymon*, the Kansas Supreme Court held that appellate counsel, a member of the Appellate Defender's Office (ADO), was ineffective for failing to foresee a change in the law created by *State v. McAdam*, 277 Kan. 136, 83 P.3d 161 (2004), and raising a sentencing issue on direct appeal. 280 Kan. at 444. The *Laymon* court held that appellate counsel's performance was objectively unreasonable for failing to preserve the *McAdam* argument when "the state of the developing Kansas law counseled in favoring of preserving the line of argument." 280 Kan. at 444. Additionally, the court noted that appellate counsel's colleagues at the ADO were heavily involved in the development of the *McAdam* issue, thus, knowledge of the issue could fairly be imputed to him. 280 Kan. at 442.

As the *Laymon* court acknowledged, the failure of appellate counsel to raise an issue on appeal is not, per se, ineffective assistance of counsel. However, the failure of direct appeal counsel "to foresee a change in the law may lead to 60-1507 relief if the failure was not objectively reasonable." 280 Kan. at 439-40; see also *State v. Shelly*, 303

23

Kan. 1027, 1045, 371 P.3d 820 (2016). Nelson's case is distinguishable from *Laymon*, though. In *Laymon*, the *McAdam* argument was a new sentencing rule developing in Kansas courts at the time of Laymon's appeal, and the Kansas Supreme Court had never ruled on it. In contrast, at the time of Nelson's appeal, the United States Supreme Court had upheld sentencing schemes similar to Kansas' hard 50 scheme, and the Kansas Supreme Court had ruled the hard 50 scheme was constitutional. Additionally, while Carver-Allmond's colleagues at the ADO were aware of the grant of certiorari in *Alleyne*, and some were recommending attorneys preserve the issue of the constitutionality of the hard 50 scheme, the Kansas ADO was not intimately involved in the *Alleyne* case.

Unlike *Laymon*, *Alleyne* was not a new sentencing rule developing in Kansas courts at the time of Nelson's appeal. In fact, it did not even address a new sentencing rule at all. In order to find Carver-Allmond ineffective in this case, we would have to hold it is objectively unreasonable for an attorney not to anticipate that the United States Supreme Court was going to overturn itself. While attorneys may be expected to foresee changes in the law, they certainly are not required to be prescient. See *Tomlin*, 35 Kan. App. 2d at 404 (an attorney need not be prescient or omniscient in anticipating changes in the law).

*Fundamental Fairness*

Nelson also argues that even if there is no right to effective assistance of counsel when filing a writ of certiorari to the United States Supreme Court, he should still get relief based on fundamental fairness. He raised this issue in a memorandum to the district court. In support of his argument, Nelson cites to *State v. Layton*, No. 98,725, 2009 WL 1859918 (Kan. 2009). *Layton* is an unpublished Kansas Supreme Court case in which the court granted relief to a criminal defendant based on the principles of "equity and fundamental fairness." 2009 WL 1859918, at *12. The case is based on a very unique set of circumstances that are not present in Nelson's case, including a "long and arduous"

procedural history with errors on both the part of the defendant's attorneys and the Kansas courts. 2009 WL 1859918, at *1, 8-11. The case appears to be without precedent and has not been relied on since it was issued. Thus, it is unlikely to provide a basis for relief in Nelson's case.

At the evidentiary hearing, Nelson testified he originally hired Ariagno regarding another criminal case, but the court appointed Ariagno to represent Nelson in the present case because Nelson could no longer afford an attorney. Nelson's testimony is a little unclear on this point, but he seems to testify he only meet with Ariagno a total of three times. He met with Ariagno only two times before his first trial—once at the McPherson County jail and once at the courthouse. He met with Ariagno once before his second trial at the courthouse. At one of these meetings, Ariagno presented a plea bargain to Nelson, but Nelson rejected the offer. Nelson said Ariagno reacted by yelling and cursing at him and calling him names before leaving. Nelson said Ariagno presented Nelson with a second plea bargain, which Nelson also rejected. After rejecting the second offer, he stated Ariagno told him he would spend the rest of his life in jail.

Nelson stated he brought his concerns about Ariagno to the district court in a letter, but the court never discussed the issue with him. In the letter, he also mentioned he had restrictions on his phone privileges. According to Nelson, McPherson County jail placed restrictions on his phone and mail privileges while he was awaiting trial. Nelson was unable to make outgoing phone calls or purchase stamps and paper to send mail. All of his materials regarding the case was also taken from him.

Nelson told the court that Ariagno never met with him to discuss defense strategy before trial started, he did not do any outside investigation of the case, and he did not present a defense.

Nelson said that he wanted to testify and "the night that I found out the State was going to rest, I was told that I would . . . be allowed to." Ariagno was supposed to come talk to him on a Wednesday night, and Nelson would testify on Thursday. Nelson said Ariagno did not show up on Wednesday night. The next morning before trial, Nelson met with Ariagno. He asked Ariagno why he did not show up and according to Nelson Ariagno replied he had nonrefundable concert tickets. Nelson and Ariagno discussed testifying that morning. According to Nelson, Ariagno "said that he didn't have time to coach me, was his words, and he said that the State would, in so many words, tear me up up here, so . . . ."

Nelson testified Ariagno had prevented him from testifying. He did not recall if the district court had asked him if he wanted to testify, but he said if the court had asked him if he wanted to testify he would have said yes. He also said if the court asked him if he had discussed the matter with his attorney, he would have said "we discussed it but as far as what I was going to testify to, we never discussed." When asked to clarify this comment, Nelson said that though he discussed testifying with Ariagno,

> "I didn't know what he was going to ask, what type of—you know. I didn't know what I was supposed to say here. All I knew was he was going to come and speak to me about taking the stand on Thursday and that was as far as the conversation went."

Nelson testified that Ariagno had presented a self-defense theory at trial but did not call any witnesses. He stated that he had never discussed possible witnesses with Ariagno. He wished Ariagno had called his grandmother, Doris Nelson, and his sister, Darcy Holub, who could testify about the volatile relationship between Nelson and Swartz. According to Nelson, another witness could have testified Nelson never asked Hewitt to help him beat up Swartz or offered him money to do so. According to Nelson, Ariagno did not present any evidence at his initial sentencing, either.

Doris Nelson, Nelson's grandmother, testified she met with Ariagno before trial to discuss Nelson's case. She said they talked for "a long time" and she told Ariagno about Nelson's relationship with Swartz, but most of her information was based on what Nelson's mother had told her. According to Doris, Ariagno told her she did not have anything helpful to Nelson's case. Doris also testified she was with Nelson and Ariagno at the McPherson County jail when Ariagno presented the plea bargain to Nelson. She stated that when Nelson rejected the offer, Ariagno told Nelson he was "stupid," and the plea was the best Ariagno could do for him. According to Doris, Ariagno also said, "If you want fifty years, I'll get you fifty years."

Ariagno testified that he "absolutely" met with Nelson more than three times prior to his first trial. He could not remember for sure, but he estimated they met between "half a dozen to a dozen times." He also was not sure how many times he met with Nelson before his second trial but he again estimated they met about a half dozen times. He admitted he may not have met with Nelson as often as Nelson might have liked, but at some point the information covered in their meetings became repetitive.

Ariagno told the court that he had regular contact with Nelson. He talked to Nelson by phone, and Nelson also sent him letters. According to Ariagno, the McPherson County jail was "very accommodating," and it would set up phone conferences so the two could talk.

Ariagno testified that in preparation for trial he did legal research and reviewed evidence and discovery materials. He also investigated potential witnesses. Ariagno spoke with Doris, "Nelson's girlfriend," and Holub as potential witnesses but did not believe they had any helpful information. He chose not to call any character witnesses because he did not want to open up any character issues at trial. He believed the theory of defense at trial was self-defense, but he did not remember much about the case or how it proceeded.

Ariagno also testified he discussed the case and possible defenses with Nelson. He said he discussed whether Nelson should testify. He advised Nelson that he did not believe it was a good idea but told him he would help Nelson prepare if he did decide to testify.

Ariagno testified he discussed the matter with Nelson and advised him against testifying. He said he told Nelson "it was his decision and his decision alone and he could make whatever decision he wanted, but I told him I didn't think he'd make a very good witness and that he would subject himself to cross examination that I didn't think was a good idea." Ariagno said he would not have said he would "coach" Nelson, but he did offer to help prepare Nelson if Nelson wanted the help. Ariagno did not recall whether he made a meeting on a Wednesday to discuss Nelson's possible testimony. He stated he was "sure [he] had that meeting, probably on more than one occasion" but he could not say when. Ariagno testified he did not prevent Nelson from testifying at either of his trials. He also specifically denied missing any meetings due to nonrefundable concert tickets.

According to Ariagno, he had encouraged Nelson to take the plea agreement because he believed it was a favorable agreement, and Nelson had a good chance of losing at trial. He did not remember discussing waiving a jury trial with Nelson. Ariagno testified he believed jury trials were better for his clients, and he would not do a bench trial, particularly for a case as serious as Nelson's. He did not remember discussing an appeal with Nelson, but his standard practice is to encourage his clients to appeal.

The district court found Ariagno's performance was not deficient. It noted Ariagno spent a great deal of time and effort preparing and trying Nelson's case. There were clearly some points of disagreement between Nelson and Ariagno, but in a case such as Nelson's, defense counsel often must deliver unwelcome news and professional advice.

The court found, however, that Ariagno's performance fell within the bounds of competent counsel.

The district court went on to note that because Ariagno's performance was not deficient, it need not address the element of prejudice. The court did point out, however, that the State's evidence was strong and compelling. Thus, even if Ariagno's performance had been deficient, it is unlikely that it led to prejudice in Nelson's case.

*Standard of Review*

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the district court conducts a full evidentiary hearing on such claims, the appellate courts determine whether substantial competent evidence supports the district court's findings and determine whether the factual findings support the court's legal conclusions; the appellate courts apply a de novo standard to the district court's conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

*Ineffective Assistance of Counsel*

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, *i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882-83, 335 P.3d 1162 (2014) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment

29

supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (quoting *Strickland*, 466 U.S. at 690-91.

*Deficient Performance*

Nelson claims Ariagno's performance was deficient because he failed to communicate with Nelson, and he failed to investigate and provide a defense at trial. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

Nelson and Ariagno provided conflicting testimony at the evidentiary hearing. Nelson testified that he only met with Ariagno a few times before his trial. His testimony is somewhat inconsistent on this point, ranging from two to four meetings not including telephone calls or court appearances.

Ariagno testified he met with Nelson at least a half dozen times before his mistrial and another half dozen times before his second trial. He also stated that he had regular contact with Nelson by phone and through the mail. He admitted he may not have met with Nelson as often as Nelson would have liked, but he found the meetings became repetitive and did not result in new information.

Nelson also claims Ariagno failed to investigate witnesses and did not present enough evidence supporting Nelson's defense theory. Ariagno, however, testified that he did legal research and reviewed evidence and discovery materials in preparation for trial. He also investigated all three of Nelson's proposed witnesses. Doris even confirmed that she talked with Ariagno for a long time, including about her possible testimony. After

30

speaking with the proposed witnesses, Ariagno concluded they did not have any helpful information. The witnesses would only be able to testify to the volatile relationship between Nelson and Swartz, which could bolster Nelson's defense but could just as easily provide a motive for premeditation.

Because Nelson and Ariagno presented conflicting testimony, the resolution of this matter ultimately came down to a credibility determination between the two. The district court apparently found Ariagno's testimony more credible, and his testimony supports a finding that his performance passed constitutional muster. While he did not call Nelson's proposed witnesses, this was a strategic decision made after investigation of both law and fact and is thus virtually unchallengeable. See *Cheatham*, 296 Kan. at 437. Moreover, we do not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *Flynn v. State*, 281 Kan. 1154, 1163, 136 P.3d 909 (2006). Therefore, the district court's finding on the first prong of the *Strickland* standard stands.

Nelson asserts that the district court failed to consider other evidence he presented in a memorandum to the court of Ariagno's deficient performance. The first piece of evidence is a letter to the district court file-stamped December 18, 2007. In the letter, Nelson complained to the judge that he was unable to communicate with his attorney because his phone privileges had been taken away. This letter conflicts with Nelson's testimony at the evidentiary hearing, because Nelson testified that he wrote a letter regarding his concerns about Ariagno, and only tangentially mentioned the issue with his phone privileges.

The second piece of evidence is the transcript from a hearing on January 24, 2008. At the hearing, Ariagno informed the district court that he was unable to communicate with his client due to the phone privileges issue. He requested that the court order the jail to allow him to be able to communicate with his client. As the State points out, this

31

evidence demonstrates that Ariagno not only brought these restrictions to the attention of the district court, he also requested the court take action so that Ariagno and Nelson would be able to communicate.

Finally, Nelson argues the district court erred by applying the wrong burden of proof in reaching its conclusion. In its journal entry, the court cited the *Strickland* standard, then added that "[a] claimant, such as Mr. Nelson, 'bears the heavy burden of showing no competent counsel would have taken the action that counsel did take.' See *Gissendaner v. Seaboldt*, 735 F.3d 1311 (11th Cir. 2013), *cert. denied* 135 S. Ct. 159 (2014)." Even assuming this was an elevated standard and Ariagno's performance was deficient, it would not change the outcome in this case because Nelson cannot demonstrate prejudice.

*Prejudice*

Even if Nelson were able to demonstrate Ariagno performed deficiently, he would be unable to show that Ariagno's performance prejudiced him. To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

The evidence against Nelson at trial was overwhelming. Nelson and Swartz had a volatile relationship. Nelson offered his friend money to help him "take care of" Swartz. He waited outside Swartz' home on the night of the attack with a bat before losing his nerve. He then returned to Swartz' home in the early morning hours, again with a bat. Nelson told police he and Swartz got in a fight, and he hit Swartz in self-defense. The coroner testified, however, that Swartz had no defensive wounds. There were also no signs of struggle in the home.

After the attack, Nelson returned to Moore's home and told her he thought he had killed Swartz. The next day, Nelson put in an application for a new apartment, and test drove a BMW. He planned to pay for the BMW by selling Swartz' vehicles.

Nelson wished Ariagno had done more investigation and put on more evidence at trial of his self-defense theory. Based on Nelson's testimony at the evidentiary hearing, He does not have any evidence which could have significantly bolstered his defense. Nelson provided several conflicting stories to police regarding his self-defense story, and apparently the jury did not believe any of them Nelson's proposed witnesses also could only testify to the volatile relationship between Nelson and Swartz. Based on the strength of the State's evidence, any of Ariagno's claimed deficiencies did not result in prejudice. Therefore, Nelson is not entitled to relief.

Affirmed.

* * *

POWELL, J., concurring:  I join the well written and comprehensive majority opinion both in its result and rationale but must write separately to object to its reliance on *Hodes & Nauser, MDs v. Schmidt*, 52 Kan. App. 2d 274, 275, 368 P.3d 667, *rev. granted* 304 Kan. 1017 (2016), for the proposition that "Kansas courts also interpret sections 1 and 2 of the Kansas Constitution Bill of Rights as providing similar protections as the Due Process Clause and Equal Protection Clause of the United States Constitution." Slip op. at 12. Normally, one would not trifle with a mere citation, but given the significance of *Hodes*, I could not let it pass.

I object to citing *Hodes* because it holds that the Kansas Constitution recognizes a right to an abortion, not that sections 1 and 2 of the Kansas Constitution Bill of Rights provide similar protections to the Due Process and Equal Protection Clauses of the

33

United States Constitution. 52 Kan. App. 2d at 288. Moreover, it is not worthy of citation because our court, sitting en banc, was equally divided on the matter, rendering it lacking in precedential effect. See *Moore v. City of Creedmoor*, 345 N.C. 356, 372, 481 S.E.2d 14 (1997) (where court equally divided, holding has no precedential value); 5 Am. Jur. 2d, Appellate Practice § 779 (same). More importantly, only a *minority* of our court agreed with the proposition that sections 1 and 2 of the Kansas Constitution provide similar protections to the Due Process and Equal Protection Clauses of the United States Constitution. See *Hodes*, 52 Kan. App. 2d at 320-21 (Atcheson, J., concurring) (Section 1 of Kansas Constitution different from Due Process and Equal Protection Clauses of the United States Constitution); 52 Kan. App. 2d at 339 (Malone, C.J., dissenting) ("We conclude that the plain language of §§ 1 and 2 of the Kansas Constitution Bill of Rights is not similar enough to the language of the Fourteenth Amendment to find that the corresponding provisions must be applied in the same manner.").

Because *Hodes* cannot be cited to support the proposition relied upon and because a citation to *Hodes* is an unnecessary addition to the string cite in support of the point that "Kansas courts generally interpret the Kansas Bill of Rights as providing the same or similar protections as the Bill of Rights in the United States Constitution," slip op. at 12, I would have not included the citation to *Hodes* in the opinion.