NOT DESIGNATED FOR PUBLICATION

No. 121,643

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALONZO UNION,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; AARON T. ROBERTS, judge. Opinion filed October 21, 2022. Affirmed in part and vacated in part.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM:  Alonzo Union appeals the district court's restitution order following his conviction of one count of financial mistreatment of a dependent adult. The district court ordered Union to pay restitution in the amount of $31,511.26 and ordered that the award will constitute a civil judgment against him. Union claims:  (1) The district court did not have reliable evidence to support its restitution award; (2) Kansas' criminal restitution statutes violate section 5 of the Kansas Constitution Bill of Rights; and (3) Kansas' criminal restitution statutes violate *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.

1

Ct. 2348, 147 L. Ed. 2d 435 (2000). We affirm the total amount of the restitution award but vacate the order that the award will constitute a civil judgment against Union.

## FACTS

Almost all the facts are derived from the restitution hearing. Union met Jean Miller in 2007 and began living with her the next year. In January 2015, the two were living in a house that Union said they rented from The Rent Company. Miller resided at Riverbend Nursing Facility (Riverbend) from July 2016 to March 2017. When she left the facility, she lived with Union at a different house which they also rented from The Rent Company. Union testified that he paid half of the rent with his money and half with Miller's money, but he did not have any documentary evidence.

Union had access to Miller's bank account as early as 2014, though he did not have a power of attorney until March 2016. During the relevant time period, January 2015 through November 2017, Miller received about $52,000 from social security and her husband's pension. Union, a veteran, had a monthly income of $1,200 from his Veterans Administration pension. At some point he also began receiving social security payments of $600 per month.

In November 2017, Katrina Racklyeft, an adult protective services investigator with the Department for Children and Families, was assigned to investigate alleged abuse of Miller. The investigation opened after Miller's Riverbend bill of $7,632.74 went unpaid which raised concerns about Miller's financial situation. As Miller's power of attorney and the person who admitted her to Riverbend, Union was supposed to pay the bill. Racklyeft obtained Miller's financial records and reviewed them for charges Union made that she did not believe contributed to Miller's care. The time she reviewed was between January 2015 and November 2017.

2

As a result of Racklyeft's investigation, the State charged Union with two counts of mistreatment of a dependent adult. Union ultimately pled no contest to one count of financial mistreatment of a dependent adult. The factual basis for the plea was that between January 2015 and November 2017, Union controlled Miller's financial resources. Miller, who was in her 80s, was unable to care for her own financial interests due to dementia and diminished physical abilities. Though entrusted with Miller's resources so that he could provide for her care and treatment, Union spent at least $25,000 but less than $100,000 on himself.

The district court sentenced Union to 43 months' imprisonment but granted his motion for dispositional departure and placed him on probation for 36 months. At the sentencing hearing, Miller's brother testified that Miller had passed away while the case was pending. Because of Union's objection to restitution, the district court held a separate evidentiary hearing to determine the amount of restitution. Three people testified at the hearing—Racklyeft, Union, and Crystal Cartwright.

Racklyeft testified about several charges that she could not confirm were spent on Miller. For example, she found over $30,000 in ATM withdrawals but, as Union did not have receipts, Racklyeft could not discern how the money was spent. When she asked Union, he said he spent the cash on the house and furnishings. Racklyeft also found $9,365.28 charged for purchases at Walmart, some of which were made in Minnesota. Racklyeft identified a few charges to Capital One and USAA that she thought were irregular because of the sporadic nature of the charges. She thought USAA was a veteran's insurance, so it was likely Union's. She identified similar charges to New York Life Insurance and life insurance from Mutual of Omaha. Finally, Racklyeft noted many other assorted charges to Miller's account that she did not think were for Miller's benefit. These included charges at liquor stores, the YMCA, Men's Warehouse, Off Broadway Shoes, the casino, and a singles website. There were also out-of-state purchases, cable television charges, and over $1,900 charged to the postal service.

The primary evidence before the district court was written exhibits representing Miller's records of receipts and expenditures. These were records of all transactions using a Netspend debit card. The record on appeal includes receipts and expenditures between November 15, 2014, and June 18, 2017, in a 24-page Netspend summary. There is a 4-month gap in records, but they continue with a partial Netspend summary that spans October 29, 2017, through November 9, 2017.

There was a pattern of withdrawals from Miller's account. The account was credited monthly with Miller's income. Almost every month the money was quickly spent. Besides the many ATM withdrawals, there were dozens of purchases at restaurants and liquor stores. Sometimes these withdrawals would leave Miller without funds in her account for weeks at a time. There were charges to Miller's account even when she was living at Riverbend. As Racklyeft testified, Riverbend provided Miller with a place to live and attended to her daily needs, so one would expect that the charges on her account would slow or stop. But they continued as usual. During the time that Miller was in Riverbend, Union incurred charges for ATM withdrawals, food, casinos, liquor stores, and travel. He also made many purchases in Minnesota.

Union testified and admitted that some of his expenditures from Miller's account were improper, such as the liquor store purchases as Miller did not drink. He testified that there may have been a few other inappropriate charges but not many. Union admitted to incurring charges in Minnesota while Miller was at Riverbend. He said he used Miller's vehicle, as well as her money, to finance his drives back and forth between Minnesota and Kansas. Union explained some of the expenditures identified by Racklyeft. He used her debit card to purchase money orders to get several things. The postal service charges were for money orders to pay the first and last month's rent for the house he rented with Miller after she left Riverbend. He testified that he got money orders from Walmart, mostly to pay for Miller's vehicle which was financed through Capital One. He also explained that Miller was a "silver sneaker" and part of a group of elderly people who go

to the YMCA. Miller also enjoyed watching television which is why there was a charge for cable. Union said the ATM withdrawals were all "for us" for the house and food.

Cartwright, Miller's niece, briefly testified for Union. She testified that she visited Miller once or twice a month between 2015 and 2017. Cartwright stated that she did not have any concerns about Union's care for Miller during that period.

After hearing the evidence, the district court took the case under advisement. The district court later filed a written order and ordered Union to pay $31,511.26 in restitution for these things:

| | |
|---|---|
| Riverbend Nursing Home | $7,632.74 |
| Half of ATM withdrawals | $15,244.89 |
| Liquor Store Purchases | $531.67 |
| Out-of-State Purchases | $3,115.59 |
| Elite Singles Dating Website | $119.70 |
| Men's Wearhouse | $184.03 |
| Half of Walmart Purchases | $4,682.64 |
| Total | $31,511.26 |

In the written order, the district court found that the evidence showed that Union "willfully and consistently failed to properly care for the financial interests of [Miller]." The district court found that Union provided no documentation to support his claim that the ATM withdrawals and the Walmart purchases were for Miller's benefit. Given the dishonest nature of the crime and Union's failure to account for his expenditures, the district court found "clear and convincing circumstantial evidence that [Union] spent a significant portion of Ms. Miller's money on himself, with no concurrent benefit to her." The district court found it likely that Union used cash to conceal his improper spending,

5

and the court believed its attribution of only 50% of these expenditures to Union was "generously low."

As for the charges to Capital One, Off Broadway Shoes, USAA insurance, YMCA, the cable bill, the postal service, and the Mutual of Omaha and New York Life insurance payments, the district court did not think there was enough evidence to find Union financially responsible. The district court found that $7,632.74 was owed directly to Riverbend and the remainder to Miller's estate. Finally, the district court found that the restitution owed by Union "will constitute a civil judgment against him by process of law. K.S.A. 21-6604(b)(2)." Union timely appealed the district court's judgment.

### IS THE DISTRICT COURT'S RESTITUTION ORDER SUPPORTED BY SUBSTANTIAL COMPETENT EVIDENCE?

Union first claims the district court did not have reliable evidence to support its restitution award. Union challenges two components of the district court's order for lack of evidence: (1) that his crime caused the Riverbend bill of $7,632.74; and (2) that his ATM withdrawals and Walmart expenditures caused loss to Miller. Union does not contest the other bills the court ordered him to pay. The State asserts that the restitution amount ordered by the district court was supported by substantial competent evidence.

Appellate review of an order directing a criminal defendant to pay restitution can involve three standards of review. Appellate courts review the "'amount of restitution and the manner in which it is [to be] made to the aggrieved party'" for abuse of discretion. *State v. Martin*, 308 Kan. 1343, 1349, 429 P.3d 896 (2018). Appellate courts affirm the district court's factual findings underlying the causal link between the crime and the victim's loss if substantial competent evidence supports these findings. 308 Kan. at 1349. Finally, appellate courts exercise unlimited review of legal questions involving the interpretation of the restitution statutes. 308 Kan. at 1350.

6

In sentencing a defendant, a court can "order the defendant to pay restitution, which shall include, but not be limited to, damage or loss caused by the defendant's crime." K.S.A. 2021 Supp. 21-6604(b)(1). The Kansas Supreme Court has held that the statute does not require "the crime of conviction have a *direct* causal link to any damages." *State v. Arnett*, 307 Kan. 648, 653, 413 P.3d 787 (2018). Rather, "the causal link between a defendant's crime and the restitution damages for which the defendant is held liable must satisfy the traditional elements of proximate cause: cause-in-fact and legal causation." 307 Kan. at 655. To establish causation-in-fact, there must be proof that it is more likely than not that, but for the defendant's conduct, the victim's damages would not have occurred. 307 Kan. at 654. Even if the defendant's conduct is the cause-in-fact of the victim's loss, legal causation restricts liability to situations in which "it was foreseeable that the defendant's conduct might have created a risk of harm and the result of that conduct and any contributing causes were foreseeable." 307 Kan. at 655.

The same rigidness and proof of value required in a civil action does not apply to determining restitution in a criminal case. *State v. Applegate*, 266 Kan. 1072, 1079, 976 P.2d 936 (1999). An appellate court should not disturb the district court's restitution award so long as it "'is based on reliable evidence'" and "'yields a defensible restitution figure.'" *State v. Hall*, 297 Kan. 709, 714, 304 P.3d 677 (2013) (quoting *State v. Hunziker*, 274 Kan. 655, 660, 56 P.3d 202 [2002]).

*Riverbend bill*

Union does not contest the amount owed to Riverbend. Instead, he contends that the district court could not order him to pay Riverbend for the unpaid bill because no evidence showed that it harmed Miller. Union asserts that the only damages that could be part of the restitution order are damages to Miller.

7

Union's position has no support in Kansas law. K.S.A. 2021 Supp. 21-6604(b)(1) authorizes the district court to include any damage or loss caused by the defendant's crime. The statute contains no limitation as to who can be damaged. In other words, the district court can order the defendant to pay restitution to any person or business entity provided their loss is caused by the defendant's crime. See, e.g., *State v. Robison*, 58 Kan. App. 2d 380, 393-94, 469 P.3d 83 (2020) (upholding restitution order to officer's insurance carrier for paying medical bills even though officer was the direct victim of the crime), *aff'd* 314 Kan. 245, 496 P.3d 892 (2021), *cert. denied* 142 S. Ct. 2868 (2022).

There was a causal connection between Union's crime and the unpaid Riverbend bill. Substantial competent evidence supports the district court's finding that Union caused the loss—Union's admission that he was responsible for the bill, Racklyeft's testimony that Union was supposed to pay the bill as Miller's power of attorney, and the undisputed evidence on the amount of the bill. We reject Union's argument that the Riverbend bill must be stricken from the restitution order.

*ATM withdrawals and Walmart purchases*

Union also argues that substantial competent evidence does not support the district court's award of half the ATM withdrawals and Walmart purchases. He asserts that the district court's decision stemmed from a lack of evidence and the court improperly shifted the burden of proof to him to show that he had not misused Miller's funds.

Because of Union's failure to keep records, there is a lack of direct evidence showing how he spent Miller's cash and what he bought at Walmart. But there was ample circumstantial evidence to support the district court's finding that the funds were not for Miller's benefit. "[C]ircumstantial evidence affords a basis for a reasonable inference by the [factfinder] regarding a fact at issue." *State v. Logsdon*, 304 Kan. 3, Syl. ¶ 3, 371 P.3d 836 (2016). A factfinder may "infer the existence of a material fact from circumstantial

evidence, even though the evidence does not exclude every other reasonable conclusion or inference." *State v. Scaife*, 286 Kan. 614, 618, 186 P.3d 755 (2008).

Though it is unknown what Union did with the cash or Walmart purchases, some of his purchases are known. There are dozens of charges to Miller's account from liquor stores, casinos, men's clothing stores, and other places that do not appear to benefit Miller. He also made many purchases in Minnesota while Miller was in Kansas which he admitted did not benefit Miller. Union used Miller's vehicle and her money to finance his trips between Minnesota and Kansas despite these trips being of no benefit to Miller. It is reasonable to infer that some of Union's unknown purchases were also for his benefit.

Another known fact is that Miller was at Riverbend from July 2016 through March 2017. During this time, Union was not renting a house for Miller and did not need to buy her food or other items. He was supposed to be paying Riverbend but failed to do that. So, he really should not have had much need to use Miller's account at the time. But the ATM withdrawals, Walmart purchases, and other spending patterns remained unchanged during this time. Comparing the similar spending patterns in the time that Union and Miller lived together, and the time Miller was at Riverbend, supports an inference that Union spent much of Miller's money on himself.

The nature of the cash withdrawals and Walmart purchases also conflicts with Union's claim that he used the money for monthly expenses like rent, utilities, insurance, and payments for Miller's vehicle. These expenses are typically larger, consistent amounts. But Union's cash withdrawals were frequent, sometimes occurring many times per day. The cash withdrawals were also for smaller amounts, almost always under $100. The Walmart expenses were equally sporadic. Union made a few large purchases from Walmart at the beginning of the case—$830.87 and $644.91 in January 2015, $601.89 in February 2015, $1,148.36 in March 2015—but after that the expenses were smaller, more irregular, and did not seem to be tied to any monthly payment.

9

Union argues that the district court based its decision on a lack of evidence explaining what the cash withdrawals and Walmart purchases were for. He asserts that the district court improperly shifted the burden of proof to him to show that he properly used the funds rather than placing the burden on the State to prove that he misused the funds. But that is not what happened here. The district court's decision was not based on a lack of evidence—it stemmed from the strong circumstantial evidence showing that Union used Miller's funds for his own benefit. While Union offered testimony to contradict this evidence, claiming that he spent the money on things like rent, utilities, insurance, food, and household items, the district court did not find this testimony credible. This court does not reevaluate witness credibility. *State v. Shockley*, 314 Kan. 46, 53, 494 P.3d 832 (2021). Given the dishonest nature of Union's crime and his failure to account for his expenditures, the district court's credibility assessment was reasonable.

Based on the evidence presented at the hearing, we agree with the district court's belief that attributing only half of the ATM withdrawals and the Walmart purchases to Union was "generously low." Though the evidence was largely circumstantial, Miller's bank records and the testimony from the restitution hearing provided substantial competent evidence to support the district court's restitution order. The amount was based on reliable evidence presented at the hearing and represents a defensible restitution figure for Miller's loss. *Hall*, 297 Kan. at 714; *Hunziker*, 274 Kan. at 660.

### DO KANSAS CRIMINAL RESTITUTION STATUTES VIOLATE SECTION 5 OF THE KANSAS CONSTITUTION BILL OF RIGHTS?

Union argues that Kansas' restitution statutes violate section 5 of the Kansas Constitution Bill of Rights because they encroach upon a criminal defendant's common-law right to a civil jury trial on damages caused by the defendant's crime. Because the newly asserted claim involves only a question of law arising on proved or admitted facts, we may reach the merits of Union's constitutional argument even though he did not raise

10

it before the district court. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Determining a statute's constitutionality is a question of law subject to unlimited review. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014).

Our Supreme Court recently determined that Kansas' restitution statutes violate section 5 of the Kansas Constitution Bill of Rights only to the extent they allow the conversion of any restitution orders into civil judgments. *State v. Arnett*, 314 Kan. 183, 189-95, 496 P.3d 928 (2021), *cert. denied* 142 S. Ct. 2868 (2022). This is because the scheme effectively bypasses the traditional function of juries to determine civil damages. But our Supreme Court found that the proper remedy was to sever the offending portions of the statutory scheme, rather than to vacate every restitution order. 314 Kan. at 194-95. One of the provisions struck down was K.S.A. 2020 Supp. 21-6604(b)(2). 314 Kan. 183, Syl. ¶ 6.

The district court ordered Union to pay $31,511.26 in restitution and found that the balance owed by Union "will constitute a civil judgment against him by process of law. K.S.A. 21-6604(b)(2)." The part of the order converting the restitution award to a civil judgment is constitutionally infirm and must be vacated, but this modification of the district court's order does not affect the balance of the restitution Union owes to Riverbend and Miller's estate. This court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no reason to find that our Supreme Court is departing from its recent holding in *Arnett*.

DO KANSAS' CRIMINAL RESTITUTION STATUTES VIOLATE *APPRENDI*?

Finally, Union asserts that Kansas' restitution statutes violate his right to a jury trial under the Sixth Amendment to the United States Constitution. More specifically, he

11

argues that restitution is punishment and, therefore, the restitution statutes violate his jury trial right because they allow the court to make a finding of fact that increased the penalty for his crime beyond the prescribed statutory maximum. See *Apprendi*, 530 U.S. at 476.

Because the right to a jury trial is a fundamental right under the Sixth Amendment, this court may reach the merits of Union's constitutional argument even though he did not raise it before the district court. *State v. Rizo*, 304 Kan. 974, 979-80, 377 P.3d 419 (2016). As stated above, determining a statute's constitutionality is a question of law subject to unlimited review. *Soto*, 299 Kan. at 121.

Union's argument fails under the recently decided cases of *State v. Brown*, 314 Kan. 292, 498 P.3d 167 (2021), *Robison*, 314 Kan. 245, and *Arnett*, 314 Kan. 183. In these cases, our Kansas Supreme Court addressed arguments identical to the one advanced by Union, and in each case the court found that restitution does not implicate a defendant's Sixth Amendment right to a jury trial as contemplated by *Apprendi* and its progeny. *Brown*, 314 Kan. at 308; *Robison*, 314 Kan. at 249-50; *Arnett*, 314 Kan. at 186-88. As stated above, this court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *Rodriguez*, 305 Kan. at 1144. We have no reason to find that our Supreme Court is departing from its holdings in these recent cases.

Affirmed in part and vacated in part.